**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | |
|---|---|
| CENTER FOR COALFIELD JUSTICE, WASHINGTON BRANCH NAACP, BRUCE JACOBS, JEFFREY MARKS, JUNE DEVAUGHN HYTHON, ERIKA WOROBEC, SANDRA MACIOCE, KENNETH ELLIOTT, AND DAVID DEAN | : No. 28 WAP 2024<br>:<br>: Appeal from the Order of the<br>: Commonwealth Court at No. 1172<br>: CD 2024, entered on September 24,<br>: 2024, affirming the Order of the<br>: Washington County Court of<br>: Common Pleas at No. 2024-3953,<br>: entered on August 27, 2024. |
| v. | :<br>: SUBMITTED:  October 11, 2024 |
| WASHINGTON COUNTY BOARD OF ELECTIONS, REPUBLICAN NATIONAL COMMITTEE AND REPUBLICAN PARTY OF PENNSYLVANIA | :<br>:<br>:<br>:<br>: |
| APPEAL OF: REPUBLICAN NATIONAL COMMITTEE AND REPUBLICAN PARTY OF PENNSYLVANIA | :<br>:<br>:<br>: |

**OPINION**

**JUSTICE DOUGHERTY**                    **DECIDED: SEPTEMBER 26, 2025**

When it comes to filling out paperwork, errors happen.  Sometimes those errors have serious consequences, like when electors forget to complete all necessary steps to successfully vote their Pennsylvania mail-in or absentee ballots.  *See Genser v. Butler Cty. Bd. of Elections*, 325 A.3d 458, 479 (Pa. 2024) ("the failure to follow the mandatory requirements for voting by mail nullifies the attempt to vote by mail and the ballot" under the Election Code), *cert. denied sub nom. Republican Nat'l Comm. v. Genser*, 145 S. Ct. 2778 (2025).  But, as we recently clarified, the Election Code "does not prevent the

counting of an elector's provisional ballot when the elector's mail ballot is a nullity." *Id.* at 485.[1]  On the contrary, when a county board of elections determines an elector's mail-in ballot is void, the Election Code "require[s] that, absent any other disqualifying irregularities, [a] provisional ballot[ is] to be counted[.]"  *Id.* at 485, *citing* 25 P.S. §3050(a.4)(5)(i) (a county board of elections "shall count [a provisional] ballot if the [board] confirms that the individual did not cast any other ballot . . . in the election").  These statutory provisional balloting procedures guarantee "access to the right to vote while also preventing double voting."  *Id.*

This case presents an issue not addressed in *Genser*: What happens if an elector fails to follow a mandatory requirement for voting by mail — such as correctly signing and dating the declaration envelope or sealing the ballot inside the secrecy envelope — and election officials, after becoming aware of the nullifying error, mislead the elector into believing she is prohibited from voting provisionally?  The lower courts held a county board of elections violated electors' procedural due process rights by knowingly setting aside facially defective mail-in ballots without notifying those electors their ballots would be disqualified.  The courts directed the board to provide such notice so the electors could challenge the decision to set aside these ballots or, instead, vote with a provisional ballot on Election Day.  We largely affirm.

---

[1] As in *Genser*, only mail-in ballots are presently in dispute.  However, the Election Code, *see* Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§2601-3591, treats absentee and mail-in ballots similarly.

## I. Background[2]

### A.

Effective for the 2023 Primary and General Elections, the Washington County Board of Elections (the Board) adopted a "notice and cure" policy for mail-in ballot return packets.[3] Under that policy, electors who submitted timely but patently defective return packets were notified and allowed to "cure" the errors by, *inter alia*, going to the elections office to correct a deficient date or signature, or requesting a replacement mail-in ballot. Alternatively, they could also vote a provisional ballot at their polling locations on Election Day. However, on April 11, 2024, after mail-in ballot return packets for the 2024 Primary Election had already been sent out (and some had already been returned),[4] the Board enacted a new policy that would not allow any notice or cure procedures for defective mail-in ballots. Instead, pursuant to this 2024 policy, staff in the Board's elections office

---

[2] The parties submitted to the Washington County Court of Common Pleas (trial court) a "Joint Stipulation of Facts" with exhibits pertaining to the Board's policy and elections office procedures. *See* Appellants' Brief, Ex. F (Joint Stipulation). Also attached to the filings are a transcript of the August 5, 2024 hearing in the trial court (Appellants' Brief, Ex. C) and portions of the deposition testimony of Melanie Ostrander, the Director of Elections for the Washington County Board of Elections (Appellants' Brief, Ex. H). We refer to the August 5, 2024 hearing transcript as "N.T. 8/5/24" and Director Ostrander's deposition as "Ostrander Dep."

[3] "Mail-in ballots are provided to voters in packages that contain not only the ballot, but two envelopes. One envelope, marked 'Official Election Ballot,' has come to be referred to as the 'Secrecy Envelope.' The second envelope, which we refer to as the 'Declaration Envelope' or 'Outer Envelope,' bears information including a declaration to be signed and dated by the voter and the address for the county board of elections where the ballot will be returned. Once a voter marks the ballot, the voter is required to place the ballot into the Secrecy Envelope, seal the Secrecy Envelope, and then place the Secrecy Envelope in the Declaration Envelope. 25 P.S. §3150.16(a). We refer to these three elements of the mail-in ballot so assembled as the '[r]eturn [p]acket[,]'" *Genser*, 325 A.3d at 461, or the "mail-in ballot return packet."

[4] Return packets for the 2024 Primary Election were mailed by the Board on April 1, 2024; by April 18, 2024, 170 ballots had already been returned and segregated for disqualifying errors on the outer envelopes. *See* Joint Stipulation at ¶¶31, 39. The Primary Election took place on April 23, 2024.

date-stamped the outer "declaration envelope" of each 2024 primary mail-in ballot return packet upon receipt, made decisions to set aside, or segregate, return packets with obvious disqualifying errors, such as a lack of signature or date on the outer envelope,[5] and then scanned the barcode sticker on the declaration envelope into the Statewide Uniform Registry of Electors (SURE) system.[6]

---

[5] *See* Ostrander Dep. at 74-75 (ballots with disqualifying errors placed into "different bin"); *see also* N.T. 8/5/24 at 34, 35-38, 43 (office staff made "judgment calls" by segregating ballots with a date written in the wrong place, or an incomplete or "incorrect" date not within the period between the date return packets were mailed to voters and Election Day, but "erred on the side of the voter" and did not segregate ballots that included a date in the "European" format).  Appellee-electors whose ballots were segregated made the following mistakes on the outer envelope containing the mail-in ballots they returned for the 2024 Primary Election: Bruce Jacobs failed to sign and write a date; Jeffrey Marks, Erika Worobec, Sandra Macioce, and Kenneth Elliott wrote an "incomplete" date; and June DeVaughn Hython signed in an "incorrect area" and failed to write the date.  All stated they would have attempted to vote a provisional ballot on Election Day had they known their ballots were segregated for these errors; none of their votes were counted by the Board.  *See* Joint Stipulation at ¶¶7-15.  These decisions to segregate facially defective mail-in ballots were made by office staff prior to the statutory pre-canvass and canvass on Election Day.

[6] We have explained that:

> [t]he SURE System was established in 2002 under 25 Pa.C.S. §1222.  *In re Doyle*, 304 A.3d 1091, 1096 n.3 (Pa. 2023).  The "registry is a 'single, uniform integrated computer system' maintained by the Pennsylvania Department of State which is 'a database of all registered electors in this Commonwealth.'"  *Id.*  (citing 25 Pa.C.S. §1222(c)(1)).  Each county registration commission "shall be required to use the SURE System as its general register." 25 Pa.C.S. §1222(e).  The SURE System contains voters' identifying information obtained during voter registration, and registrars, employees, and clerks of a commission who are responsible for voter registration are required to undergo training to work in the SURE System. *Doyle*, 304 A.3d at 1096 n.3 (*quoting McLinko v. Dep't of State*, 279 A.3d 539, 575 (Pa. 2022)).

> All county registration commissioners are required to maintain their registration records in the SURE System and to "add, modify and delete information in the system as is necessary and appropriate."  25 Pa.C.S. §1222(c) & (c)(4).  Both county registration commissioners and the Department of State of the Commonwealth are permitted "to review and

(continued…)

This barcode scan created an online electronic record for each voter whose mail-in ballot return packet (or at least the outer declaration envelope) was received, and in every case, the Board's elections office staff entered a status of "Record – Ballot Returned" in the SURE system.[7] The entry of the "Record – Ballot Returned" status code generated an email through SURE to the elector stating: "Your ballot has been received by [County Name] County as of [Date Recorded]. **If your county election office identifies an issue with your ballot envelopes that prevents the ballot from being**

---

search the system and to permit the sending of notices to the appropriate officials regarding death, change of address or other information which could affect the qualifications of an applicant or the registration of a registered elector." *Id.* §1222(c)(7). The SURE System must permit "the timely printing and transmission by commissions of district registers and all other information contained in the system as may be necessary for the operation of the polling places on Election Days." *Id.* §1222(c)(13). Among other functions, the SURE System also identifies "registered electors who vote in an election and the method by which their ballots were cast." *Id.* §1222(c)(20). There are uniform procedures for entering data into the SURE System, including designations of some information that must be entered and some information that may be entered. 4 Pa. Code §183.4.

*Genser*, 325 A.3d at 462.

[7] Notably, the Department of State has enabled county boards of elections to select from among several status code choices in a drop-down menu when registering the receipt of a mail-in ballot return packet. As of March 2024, these status codes included several "pending" choices that indicated some patent error on the return packet: "PEND – Incorrect date," "PEND – No date," "PEND – No signature," "PEND – No secrecy envelope," and "PEND – Other." Joint Stipulation, Ex. D, at 2 (capitalization omitted). Choosing one of these "pending" status codes triggered an automated Department of State email through the SURE system providing the elector with information about the status of their ballot, that it may not be counted due to the listed error, and a notation that the elector could cast a provisional ballot if they could not correct the error in time. *See id.* at 6-7 ("If you cannot fix your ballot return envelope in time, you can go to your polling place on election day and cast a provisional ballot."). In 2023, the Board used similar status codes when registering receipt of return packets, thus providing notice to electors about facial errors. *See* Joint Stipulation at ¶27.

**counted, you may receive another notification**.[8]  **Otherwise,** you will not receive any further updates on the status of your ballot and **you are no longer permitted to vote at your polling place location**."  Joint Stipulation, Ex. D ("Changes to SURE VR and PA Voter Services as of March 11, 2024") at 10 (emphasis added).  Office staff entered this status code "for every mail-in ballot, including mail-in ballots that were segregated for disqualifying errors."  Joint Stipulation at ¶42; *see also* Ostrander Dep. at 67, 71 (whether voter had disqualifying error or not, office would enter same SURE code, as directed by the Board); N.T. 8/5/24 at 43 (Board elections office staff had no discretion to use any other SURE drop-down code when reviewing and scanning returned 2024 primary mail-in ballot return packets).  In other words, 2024 primary electors who returned facially defective mail-in ballot return packets that were set aside received the same email message from the SURE system as electors whose return packets had no obvious errors.  And, electors who inquired about the status of their mail-in ballot return packets were told if their packet was received, but not if it was segregated as defective.  *See* Joint Stipulation at ¶44.

Moreover, on Primary Election Day, the district registers, or poll books, reflected the same information for an elector whose mail-in ballot had been received but segregated as for an elector whose mail-in ballot was not set aside.  *See id.* at ¶46 ("On Election Day, the poll books in Washington County indicated only which voters had requested a mail-in ballot and whether each such voter's ballot had been received by the

---

[8] Director Ostrander observed that, "[b]ased upon the decision made by the [Board], that sentence is misleading[,]" because the Board under its 2024 policy did not intend to send "another notification" to electors whose ballots had errors that would prevent the ballot from being counted.  Ostrander Dep. at 163.  The SURE system emails generated for code "Record – Ballot Returned" were updated in August 2024 to say only "Your ballot has been received by [County Name] as of [Date Recorded]," and also provide a link to the pavoterservices.pa.gov website.  *See Amicus* Brief of Sec'y Al Schmidt & Dep't of State at E66 ("Changes to SURE VR and PA Voter Services as of August 23, 2024").

Board."); *see also* N.T. 8/5/24 at 11 (poll book would reflect "you had returned your ballot, you had voted").[9]  None of the electors in Washington County whose mail-in ballot return packets had been set aside in the April 2024 primary cast a provisional ballot on Primary Election Day, although according to Director Ostrander, "[a]ll voters or anyone can vote a provisional ballot" on Election Day, even someone who had earlier returned a mail-in ballot with a disqualifying error.  Ostrander Dep. at 89.  Had they done so, however, the provisional vote would not have been counted by the Board, even if the elector's mail-in ballot return packet "had disqualifying errors such as a missing signature on the declaration envelope, a missing or incorrect date on the declaration envelope, or a missing secrecy envelope."  Joint Stipulation at ¶47.[10]

---

[9] The poll books are generated by the SURE system.  Deposition of Jonathan Marks, 7/23/24 (Marks Dep.), at 24-25 (poll book is the district register, which is basically a list of the registered voters for a specific election district or precinct; district registers for each county are generated from the SURE system); *id.* at 108 ("If the poll book indicates that you've already returned your ballot then your option is to vote by provisional ballot.  So the poll book will indicate that you've already returned your ballot and you're not entitled to vote the traditional manner, would have to by provisional ballot."); *see also* N.T. 8/5/24 at 11-12 (under Board's 2024 policy, where all mail-in ballots were entered in SURE as "Record – Ballot Returned," district register would indicate mail-in ballot was returned and the elector was "ineligible," regardless of whether the mail-in ballot had been segregated for disqualifying defects); Joint Stipulation, Ex. J ("Pennsylvania Provisional Voting Guidance"), at 3 ("a. If a voter was issued an absentee or mail-in ballot and successfully returned their ballot, their name will be found in section 2 of the poll book, and the signature line will say either 'Absentee – Ballot Cast/Not Eligible' or 'Mail-in – Ballot Cast/Not Eligible.'  b. If a voter listed in section 2 of the poll book believes that they have not successfully voted their absentee or mail-in ballot or otherwise contests their ballot status, the poll worker must provide the voter a provisional ballot.").

[10] Director Ostrander testified the mail-in ballots segregated by elections office staff were never reviewed by the Board at the pre-canvass on Primary Election Day, and they were all disqualified at the subsequent canvass.  N.T. 8/5/24 at 33-34.  Moreover, the Board was apparently aware that as a consequence of its April 2024 policy — specifically, its decision not to notify electors about the patent errors on their timely returned mail-in ballot return packets — these electors would not have their votes counted.  *See id.* at 32.

Following a Right-to-Know Law request, *see* 65 P.S. §§67.101-67.3104, the Board disclosed that 259 primary mail-in ballots — which the electors returned and the Board received in time to be counted — had been segregated after receipt and ultimately disqualified for errors.[11]  None of those electors attempted to cast a provisional ballot or contest their disqualification pursuant to 25 P.S. §3157.[12]  *Id.* at ¶49.  On July 1, 2024, affected electors and interest groups (collectively, appellees) filed a complaint against the Board in the Washington County Court of Common Pleas, claiming the Board's April 2024 mail-in ballot policy violated their procedural due process rights under the Pennsylvania Constitution, and seeking an injunction enjoining the Board from continuing the policy for the 2024 General Election.  The Republican National Committee and the Republican

---

[11] The parties stipulated that Washington County did not count ballots in the following timely returned mail-in ballot return packets for the April 2024 election: 126 declaration envelopes were signed, but had an "incomplete" date; 41 declaration envelopes were signed, but had an "incorrect" date; 18 declaration envelopes were signed, but undated; 3 declaration envelopes were undated and had a signature in the "wrong area"; 1 declaration envelope was not signed and had an incomplete date; 6 declaration envelopes were dated, but not signed; 52 declaration envelopes were neither signed nor dated; and 12 return packets were lacking a secrecy envelope.  Joint Stipulation at ¶51. "In total, Washington County did not count in the vote tally 259 timely-received mail-in ballots for the April 2024 Primary Election.  This represents 2% of all mail-in ballots that were timely-received by the election office.  These voters are both Democrats and Republicans."  *Id.* at ¶52.

[12] That statute pertinently provides:

> (a) Any person aggrieved by any order or decision of any county board regarding the computation or canvassing of the returns of any primary or election, or regarding any recount or recanvass thereof under sections 1701, 1702 and 1703 of this act, may appeal therefrom within two days after such order or decision shall have been made, whether then reduced to writing or not, to the court specified in this subsection, setting forth why he feels that an injustice has been done, and praying for such order as will give him relief. . . .

25 P.S. §3157(a) (footnotes omitted).

Party of Pennsylvania (appellants)[13] were allowed to intervene, the parties filed cross-motions for summary judgment, and the court heard argument on August 5, 2024, as well as testimony from Director Ostrander. *See* N.T. 8/5/2024 at 7-64.

**B.**

On August 23, 2024, the court granted appellees' motion for summary judgment in part, as well as their motion for a permanent injunction. It denied appellants' cross-motion for summary judgment. After resolving justiciability, ripeness, and standing issues in favor of appellees,[14] the court proceeded to the merits of their due process claims. The court explained procedural due process "imposes constraints on governmental decisions which deprive individuals" of life, liberty, or property. Trial Court Op. and Order, 8/23/24, at 13, *quoting Washington v. Pa. DOC*, 306 A.3d 263, 284 (Pa. 2023). It elaborated that if a court determines there is a life, liberty, or property interest with which the state has interfered, it will then examine whether the procedures for that deprivation are constitutionally sufficient. The court further explained the "basic elements of procedural due process are adequate notice, the opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case." *Id.* at 14, *quoting S.F. v. Pa. Dep't of Human Servs.*, 298 A.3d 495, 510 (Pa. Cmwlth. 2023).

The court then rejected appellants' assertion no process was due under the Legislative Act Doctrine, which provides that procedural due process is implicated by adjudications only, not by state actions that are legislative in nature.[15] The court ruled

---

[13] The Board was a defendant in the court of common pleas and an appellant in the Commonwealth Court, but the Republican National Committee and the Republican Party of Pennsylvania are the only appellants in the present matter.

[14] Although appellants repeated some of these claims in the Commonwealth Court, they have abandoned them here.

[15] Appellants have not repeated this argument in their brief to this Court.

appellees were in fact "challenging the series of individualized determinations the election staff have made and will make going forward," including their decisions "to set aside a voter's mail ballot because it has a known disqualifying error on the envelope; to miscode that ballot in the SURE system so the voter never knows the ballot will not count even though there is still time for the voter to preserve their fundamental right to vote; and ultimately to not count the voter's mail ballot." *Id.* at 14-15 (internal quotations omitted).

Getting to the crux of the due process claim, the court recognized the initial inquiry is whether a protected liberty interest exists, and that liberty interests can be created by the Due Process Clause itself or by state law. The court rejected appellants' argument electors lacked an underlying liberty interest because no Pennsylvania court has ever held voting is a liberty interest protected by due process.[16] The court held the Election Code preserves the liberty interests implicated here. First, it explained 25 P.S. §3157 creates a right to challenge decisions made by county boards at the canvass, and this constitutes a liberty interest. Second, the court explained 25 P.S. §3150.16(b)(2) gives electors who requested a mail-in ballot a statutory right to cast a provisional ballot if they are not listed on the district register as "having voted." 25 P.S. §3150.16(b)(2).[17] It held appellees raised these statutory liberty interests in their complaint. *See* Trial Court Op. and Order, 8/23/24, at 17.

Continuing to the next step of the inquiry, determining what process is due and whether a constitutional violation occurred, the court applied the test developed in

---

[16] To that argument, appellees responded there is an inextricable link between the Pennsylvania Constitution's enumerated fundamental rights and the interests protected by due process. They also asserted appellants' contrary assertion "flies in the face of the origins of the right to vote in the constitution, and its place in the Declaration of Rights alongside entitlements to other individual freedoms." Trial Court Op. and Order, 8/23/24, at 17 (internal quotations omitted).

[17] The full text of this provision is reproduced *infra* at 36.

*Mathews v. Eldridge*, 424 U.S. 319 (1976), as forwarded by appellees.[18]  *See id.* at 18-19.  Pursuant to *Mathews*, a court determines what process is due by balancing (1) the private interest affected; (2) the risk of erroneous deprivation through existing procedures and the probable value (if any) of additional procedural safeguards; and (3) the governmental interest, including costs and the administrative burdens of additional procedures.  *See id.* at 19, *citing C.S. v. Commonwealth, Dep't of Human Servs.*, 184 A.3d 600, 607 (Pa. Cmwlth. 2018).

Next, the court determined appellees' claims were not foreclosed by *Pa. Democratic Party v. Boockvar*, 238 A.3d 345 (Pa. 2020) (*Pa. Democratic Party*), which involved a number of issues related to mail-in voting.  The court noted the relevant issue in *Pa. Democratic Party* was whether this Court would — pursuant to the Free and Equal Elections Clause of the Pennsylvania Constitution[19] — mandate all county boards of elections to "contact qualified electors whose mail-in or absentee ballots contain minor facial defects resulting from their failure to comply with the statutory requirements for voting by mail, and provide them with an opportunity to cure those defects."  *Id.* at 19-20, *quoting Pa. Democratic Party*, 238 A.3d at 372.  The trial court here noted the petitioner in *Pa. Democratic Party* "cited no constitutional or statutory basis that would countenance imposing the procedure [p]etitioner s[ought] to require[.]"  *Id.* at 20, *quoting Pa. Democratic Party*, 238 A.3d at 372.  The court further observed appellees in the present

---

[18] Appellants had advocated for the *Anderson*/*Burdick* test.  *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) ("when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions") (internal quotations and citations omitted).  But they now apparently concede *Mathews* applies, as they do not raise *Anderson/Burdick* in their brief to this Court.

[19] *See* PA. CONST. art. I, §5 ("Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage.").

case raise a due process claim, which was not raised or considered in *Pa. Democratic Party*.

The trial court further explained that unlike in *Pa. Democratic Party*, appellees were not asking for a "notice and cure" procedure, but rather pre-deprivation notice so they could have an opportunity to exercise their right to vote. Applying the *Mathews* test, the trial court first identified the private interest at stake for appellees: that the Election Code provides electors "a clear and unequivocal right to challenge the decisions made by the canvass board under 25 P.S. §3157." *Id.* at 21. For the second *Mathews* factor, the trial court determined "[t]he risk of erroneous deprivation of that interest is high as electors have no notice that their ballot has been segregated and presumptively will not be counted." *Id.* Third, it held "[t]he burden on the government is low as there is a framework in place where a different entry code can be placed into a computer to provide notice to an elector that their ballot will not be counted and is subject to challenge." *Id.* It further noted Washington County's staff in its elections office have proven "more than capable of contacting electors based on the Board's 2023 policy." *Id.* Considering these factors, the court held the Board violated appellees' procedural due process rights under the *Mathews* test. The court therefore granted their motion for summary judgment on this issue. It ordered the Board, moving forward, "to notify any elector whose mail-in packet is segregated for a disqualifying error, so the voter has an opportunity to challenge (not cure) the alleged defects[, and to] input the accurate status of the mail-in packet in the SURE system and provide the status to the elector if requested." *Id.* at 27.

Finally, the court rejected appellants' argument that counting provisional ballots from these electors would improperly allow a "cure" of their deficient mail-in ballots, and rewrite election law. The court observed a provisional ballot is entirely separate from the mail-in ballot, and it allows electors to record their vote while the county board determines

whether it (or the mail-in ballot) can be counted. *See id.* at 23. The court explained *Pa. Democratic Party* did not address provisional ballots at all, and it held provisional ballots do not act as a "cure" for deficient mail-in ballots. *Id.* It also emphasized there are "proper safeguards in place to ensure double voting does not occur and that the integrity of our elections is upheld." *Id.*

The court elaborated it was not persuaded by appellants' argument that the Election Code prohibits a provisional ballot from being counted if the elections office has received an elector's mail-in ballot return packet but found it deficient.[20] It observed there are three relevant provisions addressing mail-in voting and provisional ballots. First, under 25 P.S. §3150.11(a), "[a] qualified mail-in elector shall be entitled to **vote** by an official mail-in ballot in any primary or election held in this Commonwealth in the manner provided under this article." *Id.*, *quoting* §3150.11(a) (emphasis supplied by trial court). Second, 25 P.S. §3150.16(b) provides:

(1) Any elector who receives and **votes** a mail-in ballot under section 1301-D shall not be eligible to vote at a polling place on election day. The district register at each polling place shall clearly identify electors who have received and **voted** mail-in ballots as ineligible to vote at the polling place, and district election officers shall not permit electors who **voted** a mail-in ballot to vote at the polling place.

(2) An elector who requests a mail-in ballot and who is not shown on the district register as having **voted** may vote by provisional ballot under section 1210(a.4)(1).

*Id.* at 23-24, *quoting* §3150.16(b) (emphasis supplied by trial court) (footnotes omitted). Third, 25 P.S. §3050(a.4)(5)(ii)(F) states that "[a] provisional ballot shall not be counted if: . . . the elector's absentee ballot or mail-in ballot is timely **received** by a county board of elections." *Id.* at 24, *quoting* §3050(a.4)(5)(ii)(F) (emphasis supplied by trial court).

---

[20] These are precisely the arguments presented and rejected in *Genser*, which we elaborate upon below.

The trial court recognized that while these provisions appear unambiguous when read individually, they conflict when read *in pari materia*. *See id.* (noting courts should not read statutory words in isolation but in their context). After recounting our familiar statutory interpretation canons, the court determined the statutory scheme created by the above provisions "is ambiguous as 25 P.S. §3150.16[(b)](2) provides that '[a]n elector who requests a mail-in ballot and who is not shown on the district register as having **voted** may vote by provisional ballot' while 25 P.S. §3050 states that '[a] provisional ballot shall not be counted if: the elector's absentee ballot or mail-in ballot is timely **received** by a county board of elections.'" *Id.* at 25 (emphasis supplied by trial court). It reasoned that "received" means "when the ballot is delivered by mail to the elections office or brought to the elections office in person[,]" but the meaning of "voted" is less straightforward. *Id.* at 25-26. Ultimately, the court determined the "common sense meaning of the word 'voted' denotes an expectation that the opinions expressed through that vote will be counted. . . . It is clear that an elector whose mail-in packet is deemed to have a disqualifying error did not vote." *Id.* at 26, *citing* 52 U.S.C. §10101(e) ("the word 'vote' includes all action necessary to make a vote effective including . . . casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast").

Although the trial court declined to grant summary judgment on this particular issue, it held a permanent injunction was nevertheless appropriate. *See id.* (explaining a permanent injunction requires the party seeking relief to establish (1) a clear right to relief, (2) an injunction is necessary to avoid an injury that cannot be compensated by damages, and (3) greater injury will result from refusing the requested relief). The court found all the permanent injunction factors were met, granted the injunction, and directed that, going forward, the Board's elections office must "properly document in the poll books that the elector whose mail-in packet is segregated for a disqualifying error has not 'voted' in

accordance with 25 P.S. §3150.16 and choose the most appropriate selection in the SURE system to reflect as such." *Id.* at 27-28 & n.122 (noting it "acknowledges that this injunction will not provide relief for **every** elector, however, it is the most uniform resolution available") (emphasis in original). The Board and appellants filed an appeal in the Commonwealth Court.

**C**.

A divided three-judge panel of the Commonwealth Court affirmed. *See Ctr. for Coalfield Justice v. Washington Cty. Bd. of Elections*, 328 A.3d 108, 2024 WL 4272040 (Pa. Cmwlth. Sept. 24, 2024) (unpublished memorandum).[21] It rejected many of appellants' arguments, agreeing with the trial court *Pa. Democratic Party* is distinguishable, the Election Code created a statutory right to cast a provisional ballot as a "failsafe" to ensure otherwise qualified electors can have their vote counted, and that casting a provisional ballot does not "cure" a defective mail-in ballot. *See id.* at *6.[22]

Relevant here, the panel addressed the core merits of the procedural due process claim.[23] First, the panel affirmed that appellees' liberty interests were implicated.

---

[21] The majority opinion was authored by Judge Michael H. Wojcik and joined by President Judge Renée Cohn Jubelirer; Judge Lori A. Dumas dissented without opinion.

[22] The panel below relied in part on the Commonwealth Court's decision in *Genser v. Butler Cty. Bd. of Elections*, 328 A.3d 99, 2024 WL 4051375 (Pa. Cmwlth. Sept. 5, 2024) (unpublished memorandum). This Court affirmed the judgment of the Commonwealth Court. *See Genser*, 325 A.3d 458.

[23] The panel relied on the trial court's opinion regarding justiciability, and further observed the trial court aptly reasoned procedural due process protections were applicable under the circumstances, which did not implicate the Legislative Act Doctrine: "the County Board's canvassing determinations amount to an adjudication because the canvassing determinations apply the existing provisions of the Election Code and prevent a small number of otherwise qualified electors from having their vote counted." *Ctr. for Coalfield Justice*, 2024 WL 4272040, at *7. The panel recognized the Board's 2024 policy left all mail-in and absentee electors unaware of whether their ballots would be counted, but reasoned only some electors are "thereby deprived of their two-day window to contest (continued…)

Departing slightly from the trial court, the panel first looked to Article I, Section 5 of the Pennsylvania Constitution, noting it "protects the right to vote as a fundamental right." *Id.* at *8. "In fact," the panel observed, "this right 'is pervasive of other basic civil and political rights[.]'" *Id.*, *quoting Bergdoll v. Kane*, 731 A.2d 1261, 1269 (Pa. 1999), *also citing* PA. CONST. art. I, §11 ("Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct."); 25 P.S. §3157(a) ("Any person aggrieved by any order or decision of any county board regarding the computation or canvassing of the returns of any primary or election . . . may appeal . . . to the court specified in this subsection"); 25 P.S. §3157(b) ("The court on an appeal shall have full power and authority to hear and determine all matters pertaining to any fraud or error committed in any election district to which such appeal relates[.]").

The panel reasoned "the General Assembly has directed that electors aggrieved by a county board of elections may seek redress for an injury done to them in the process of exercising the fundamental right to vote[,]" and held electors have a liberty interest to contest the disqualification of their ballots. *Id.* (noting none of the elector-challengers knew their ballots had gone uncounted until after Election Day). It further rejected appellants' distinction between segregation of received mail-in ballot return packets and canvassing, opining that while the trial court's remedy was aimed at conduct that would best apprise electors their ballots would not be counted (*i.e.*, the initial segregation for disqualifying errors), it was for the purpose of ensuring their liberty interest in challenging the Board's canvassing decision. *See id.* at *8 n.17.

Lastly, the panel held the trial court's injunction did not impose notification procedures that were too burdensome, reasoning the Board had afforded notice to

their disqualification and do not have the requisite notice of their right to cast a provisional ballot on election day." *Id.*

electors whose ballots were segregated during the 2023 elections. *See id.* at *8, *citing* Joint Stipulation at ¶¶26-27. The panel concluded "the current [p]olicy emasculates the Election Code's guarantees by depriving voters — like [e]lectors herein — the opportunity to contest their disqualification or to avail themselves of the statutory failsafe of casting a provisional ballot." *Id.* It affirmed the trial court's award of a permanent injunction and "similarly agree[d] with the trial court in all other respects." *Id.*

### D.

We granted appellants' petition for allowance of appeal, and directed briefing on the following rephrased issues:

(1) Whether the Commonwealth Court erred in holding the mail-in ballot return policy implemented by the Washington County Board of Elections resulted in violations of electors' procedural due process rights.

(2) Whether the Commonwealth Court erred in affirming the trial court's injunction and order directing the board to (1) "notify any elector whose mail-in packet is segregated for a disqualifying error, so the voter has an opportunity to challenge (not cure) the alleged defects"; (2) "input the accurate status of the mail-in packet in the SURE system and provide the status to the elector if requested"; and (3) "properly document in the poll books that the elector has not 'voted' when an elector's mail-in packet is segregated for a disqualifying defect in accordance with 25 P.S. §3150.16 (which will allow the elector the opportunity to cast a provisional ballot) and choose the most appropriate selection in the SURE system to reflect as such." Opinion and Order, *Ctr. for Coalfield Justice v. Washington Cty. Bd. of Elections*, No. 2024-3953, at 4 (C.P. Washington, Aug. 23, 2024).

*Ctr. for Coalfield Justice v. Washington Cty. Bd. of Elections*, 327 A.3d 184, 184-85 (Pa. 2024) (*per curiam*).[24] These issues present questions of law, over which our standard of

---

[24] After appellants filed their petition for allowance of appeal, the Board approved a new policy consistent with the trial court's injunction. *See* Appellees' Brief at 15 & n.7, *citing* Mike Jones, *Elections board approves new mail-in ballot policy for Washington Co.*, Observer-Reporter (Oct. 3, 2024), https://www.observer-
(continued…)

review is *de novo* and our scope of review plenary.  *See Buffalo Twp. v. Jones*, 813 A.2d 659, 664 n.4 (Pa. 2002).

## II.  Discussion

### A.  Procedural Due Process

Appellees brought their procedural due process claim under Article I, Section 1 of the Pennsylvania Constitution, which provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."  PA. CONST. art. I, §1.  We have explained that in light of procedural due process guarantees, the "government is prohibited from depriving individuals of life, liberty, or property, unless it provides the process that is due.  While not capable of an exact definition, the basic elements of procedural due process are adequate notice, the opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case."  *Commonwealth v. Turner*, 80 A.3d 754, 764 (Pa. 2013).  Courts considering procedural due process questions should proceed "in two steps: the first asks whether there is a life, liberty, or property interest that the state has interfered with; and the second examines whether the procedures attendant to that deprivation were constitutionally sufficient."  *Id.*

Although appellees bring their claim under the state charter, and we resolve this case under our own Constitution, the test developed by the United States Supreme Court in *Mathews* guides our analysis of procedural due process claims in this Commonwealth. *See R. v. Dep't of Pub. Welfare*, 636 A.2d 142, 153 (Pa. 1994) ("we adopt the *Mathews*

reporter.com/news/election/2024/oct/03/elections-board-approves-new-mail-in-ballot-policy-for-washington-co/ ("'At present, we are operating under the order of Judge Brandon Neuman,' county solicitor Gary Sweat told the elections board.") (last visited Sept. 24, 2025).

methodology to assess due process claims brought under Section 1 of Article I of the Pennsylvania Constitution"). As we have described it, under the *Mathews* test, "[a]scertaining what process is due entails a balancing of three considerations: (1) the private interest affected by the governmental action; (2) the risk of an erroneous deprivation together with the value of additional or substitute safeguards; and (3) the state interest involved, including the administrative burden the additional or substitute procedural requirements would impose on the state." *Bundy v. Wetzel*, 184 A.3d 551, 557 (Pa. 2018), *citing Mathews*, 424 U.S. at 335. In line with this balancing test, we have acknowledged that "[d]ue process is a flexible concept which 'varies with the particular situation.'" *Id.*, *quoting Zinermon v. Burch*, 494 U.S. 113, 127 (1990).

Also relevant here, we have described notice as "the most basic requirement of due process." *Pa. Coal Mining Ass'n v. Ins. Dep't*, 370 A.2d 685, 692 (Pa. 1977). "Without notice," parties "cannot take advantage of any of the other procedural safeguards made available to [them]." *Id.*; *see Angle v. Commonwealth*, 153 A.2d 912, 914-15 (Pa. 1959) ("the most rudimentary requirement of due process in eminent domain proceedings is that the landowner shall know that his land is being taken or is about to be taken"); *see also* Frederick D. Rapone, Jr., *Due Process Rights Under the Pennsylvania Constitution*, *in* THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES, §33.3, 890 (Ken Gormley, *et al.* eds., 2d ed. 2020) ("The Pennsylvania Supreme Court has long-recognized that the concept of notice is the bedrock upon which any construction of due process rests.").

### 1. Protected Liberty Interest

As stated above, the first step in the procedural due process analysis is to determine whether there is a protected interest with which the government has interfered.

*See Turner*, 80 A.3d at 764. Here, the parties dispute whether the Board's policy interfered with electors' liberty interests.

Appellants argue the Commonwealth Court majority failed to identify a cognizable liberty interest implicated by the policy. First, they claim there is no "failsafe" right to cast a provisional ballot, arguing "[t]he General Assembly's mandate here could not be clearer: 'A provisional ballot **shall not be counted if** the elector's absentee ballot or mail-in ballot is **timely received** by a county board of elections.'" Appellants' Brief at 21-22, *quoting* 25 P.S. §3050(a.4)(5)(ii)(F) (emphasis supplied by appellants). They claim nothing in this provision hinges on whether the elector's mail-in ballot is "valid," and the prohibition on "counting" a provisional ballot turns only on whether the return packet was "timely received." *Id.* at 22. Appellants argue this statute is unambiguous, and the panel majority below erred when it held the Election Code creates a "right to cast a provisional ballot as a 'failsafe[.]'" *Id.* at 22-23, *quoting* Commonwealth Court Op. at 13. Instead, they claim the Code forecloses any such liberty interest.

On this point, appellants contend the majority below erred in its "wholesale adoption" of the Commonwealth Court's decision in *Genser*. *Id.* at 23. They claim that earlier decision conflicts with the Election Code and "provides no basis to **constitutionalize** a right to 'failsafe' provisional voting[.]" *Id.* (emphasis in original). Appellants further aver the court below improperly distinguished this Court's decision in *Pa. Democratic Party*, which they frame as having held "a voter has no constitutional, statutory, or legal right to be provided notice of and an opportunity to cure a mail-ballot defect, through provisional voting or otherwise." *Id.* at 24.[25] They rely on our statement that "the decision to provide a 'notice and opportunity to cure' procedure to alleviate that risk [of ballot rejections due to defects] is one best suited for the Legislature." *Pa.*

---

[25] We discuss *Pa. Democratic Party* in more detail *infra*.

*Democratic Party*, 238 A.3d at 374. According to them, the difference between a provisional voting right and a right to cure is "a distinction without a difference," so *Pa. Democratic Party* forecloses a judicially created "failsafe" right to provisional voting. Appellants' Brief at 25.[26]

Next, appellants argue the constitutional right to vote is not a liberty interest. In support, they point to our parenthetical statement in *Turner* (a criminal case about whether there is a liberty interest in collateral review after completion of one's sentence) that "liberty interests that are protected by procedural due process are generally limited to freedom from restraint." *Id.* at 27, *quoting Turner*, 80 A.3d at 765.[27] Appellants further argue the status of the right to vote as "fundamental" does not establish it as a liberty interest. *See id.*, *citing Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 231 (5th Cir. 2020) ("For procedural due process, the question is not whether the plaintiffs assert a **fundamental right**, but instead whether the right they assert is a **liberty interest**.") (emphasis in original). They identify a handful of federal court decisions rejecting procedural due process claims based on the right to vote. *See id.* Additionally, appellants assert, even if the right to vote is a liberty interest, it is not implicated by the Board's policy or this case, as the right does not give an elector "*carte blanche* to cast ballots in any way

---

[26] Appellants also reject the argument that federal law requires electors who have submitted defective mail-in ballot return packets be allowed to vote provisionally. *See* Appellants' Brief at 25, *citing* 52 U.S.C. §21082(a) (HAVA). They argue an individual has no such federal right unless they declare they are eligible to vote provisionally under state law, and that electors whose return packets are "timely received" are not eligible. *See id.*, *citing* 25 P.S. §3050(a.4)(5)(ii)(F). They further argue that even if 52 U.S.C. §21082(a) creates a blanket right to cast a provisional ballot, it only requires provisional ballots to be counted if they are valid under state law, which they claim is not the case in Pennsylvania where an elector's mail-in ballot return packet has been "timely received." *Id.* at 26.

[27] Although *Turner* discusses general due process principles, the specific due process challenges in that case were raised under Article I, Section 9 of the Pennsylvania Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. *See* 80 A.3d at 761, 763.

he or she chooses." *Id.* The right to vote, they explain, does not include "the right to have a ballot counted that is defective under state law." *Id.* at 27-28, *quoting Pa. State Conf. of NAACP v. Sec'y of Pa.*, 97 F.4th 120, 133 (3d Cir. 2024). Appellants reiterate their position that *Pa. Democratic Party* held "the General Assembly has forbidden do-overs[,]" and they claim "[t]he Pennsylvania Constitution does not entitle noncompliant voters to notice of defects that they, by definition, cannot correct." *Id.* at 28.

Finally, appellants argue Section 3157 of the Election Code — which provides an appeal right to "[a]ny person aggrieved by any order or decision of any county board regarding the computation or canvassing of the **returns** of any primary or election[,]" 25 P.S. §3157 (emphasis supplied by appellants) — does not create a protected liberty interest. Appellants' Brief at 28. They claim there can be no liberty interest in a statute providing an appeal right because "[p]rocess is not an end in itself[.]" *Id.*, *quoting Turner*, 80 A.3d at 765. Appellants argue a right to appeal canvassing decisions cannot be used to impose an interest in voting "in any manner one prefers," and they highlight appellees did not actually invoke Section 3157 in their complaint. *Id.* at 29. Appellants also note canvassing is "public[ ]," *id.*, *quoting* 25 P.S. §3154(a), and that anyone who wants to raise a challenge pursuant to Section 3157(a) is free to attend the canvass.[28]

In response, appellees contend the express voting rights in the state Constitution establish protectable interests, explaining "[t]he fact that an interest 'is recognized and protected by our highest state law[,] our Constitution[,]' through 'explicit reference . . . provid[es] the basis for this Court to regard it as a fundamental interest which cannot be

---

[28] *Amici* Bryan Cutler, former Republican leader of the Pennsylvania House of Representatives, Kim Ward, President Pro Tempore of the Pennsylvania Senate, and Joe Pittman, majority leader of the Pennsylvania Senate (Legislators), filed a brief in support of appellants. They echo appellants' arguments that there is no liberty interest at stake here, the trial court improperly expanded the meaning of canvassing as used in 25 P.S. §3157, and there is likewise no right to cure a defective mail-in ballot return packet by casting a provisional ballot.

abridged without compliance with constitutional standards of due process.'" Appellees' Brief at 18-19, *quoting R.*, 636 A.2d at 149. They explain this Court has categorized the right to vote as "fundamental," and stress that unlike the United States Constitution, the Pennsylvania charter expressly protects the right to vote in Article I, Section 5 and Article VII, Section 1. Appellees note this Court has directly linked the right to vote to citizens' freedom based on its place in the declaration of rights, *see League of Women Voters of Pa. v. Commonwealth*, 178 A.3d 737, 804 (Pa. 2018), and how the right includes "not just the right of 'each voter under the law . . . to cast his ballot and have it honestly counted' but also a guarantee against any 'regulation of the right to exercise the franchise' that could 'deny the franchise itself, or make it so difficult as to amount to a denial.'" Appellees' Brief at 20, *quoting Winston v. Moore*, 91 A. 520, 523 (Pa. 1914). Moreover, they explain appellants' argument to the contrary relies primarily on the Fifth Circuit's decision in *Richardson*, which interpreted the federal Constitution and has since been deemed an outlier with an overly constricted view of liberty. *See id.* at 21 & n.10 (a "majority of federal courts that have considered the question have found that voting is a liberty interest entitled to the protections of due process"). Thus, they conclude the right to vote is a liberty interest subject to procedural due process protections.

Further, appellees argue, included within the right to vote is the statutory right to vote a provisional ballot. They argue the Commonwealth Court in *Genser* correctly held the Election Code authorizes the right to vote by provisional ballot for an elector who fails to successfully vote by mail; it does not, as appellants claim, constitute a forbidden do-over. Instead, they argue the statutory provisional ballot "guarantee is a cognizable liberty interest, consistent with the broader protections for the franchise in the Pennsylvania Constitution and the Election Code[,]" and it therefore implicates procedural due process. *Id.* at 24-25.

Appellees acknowledge the lower courts also found a liberty interest arising from the right to challenge decisions regarding canvassing in 25 P.S. §3157. *See id.* at 25 n.11. They observe, however, that the Court need not reach that question because "due process protections are clearly triggered by the constitutional right to vote and the statutory right to vote by provisional ballot." *Id.* Plus, appellees explain that notice to show up to the canvass would not allow for an opportunity to vote a provisional ballot on Election Day. Here, they highlight, none of the impacted electors were given any notice their mail-in ballot return packet had been rejected, either before or after Election Day.[29]

We hold protected liberty interests are implicated in this case. "Protected liberty interests may arise from two sources — the Due Process Clause itself and the laws of the States." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989) (internal quotations and citation omitted); *see also Turner*, 80 A.3d at 766 (acknowledging "the legislature was free to extend a statutory right . . . and, had they done so, they would be constitutionally obligated to ensure that those rights were impacted only in accord with due process"). In *Turner*, we described "liberty interests" as involving a legal "entitlement." *Id.* at 765, *citing*, *inter alia*, *Thompson*, 490 U.S. at 460 ("an individual claiming a protected interest must have a legitimate claim of entitlement to it"); *see also Bell v. Thornburgh*, 420 A.2d 443, 449 (Pa. 1980) ("The determinative question is whether the litigant holds such a legitimate 'claim of entitlement' that the Constitution, rather than the political branches, must define the procedures attending its removal[.] Claims of entitlement spring from expectations that are 'justifiable,' . . . 'protectable,' . . . 'sufficient,'

---

[29] The Court received *amicus curiae* briefs in support of appellees from County Commissioners, the Democratic National Committee and the Pennsylvania Democratic Party (DNC), and AFT Pennsylvania and Pennsylvania Alliance for Retired Americans (AFTPa). All agree that Pennsylvanians have a liberty interest arising from their fundamental right to vote enshrined in the Pennsylvania Constitution and the Election Code. They argue due process protections, including timely and accurate pre-deprivation notice of mail-in ballot return packet defects, attach to that interest.

. . . or 'proper.'") (citations omitted), *quoting O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 796 (1980) (Blackmun, J., concurring). The source of a legal entitlement may be explicit or implicit. *See Pa. Coal Mining Ass'n*, 370 A.2d at 690 ("To require an explicit 'statutory entitlement' before due process safeguards attach is to invite a return to the discredited rights/privileges distinction, because it bases an individual's due process rights on the label a statute attaches to the interest.").[30] However, whether a claim of entitlement is legitimate, and thus implicates a liberty interest protected by due process, "depends on the nature of the government activity and the citizen's dependency and reliance on that activity." *Id.*; *see Sweeney v. Tucker*, 375 A.2d 698, 713 (Pa. 1977) ("Whether an interest is entitled to due process protections depends on the nature of the governmental activity and the citizen's dependency and justifiable reliance on that activity.").

The parties disagree about whether the Pennsylvania Constitution itself creates a liberty interest in the right to vote that implicates the protections of procedural due process. We hold it does. The two provisions at issue are the Free and Equal Elections Clause in Article I, Section 5, and the Qualifications of Electors provision in Article VII, Section 1. Preliminarily, we note these provisions distinguish the Pennsylvania Constitution from the federal charter: "the United States Constitution — which furnishes no explicit protections for an individual's electoral rights, nor sets any minimum standards for a state's conduct of the electoral process — does not contain, nor has it ever contained, [ ] analogous provision[s]." *League of Women Voters*, 178 A.3d at 804.

---

[30] Although *Pa. Coal Mining Ass'n* dealt with property interests, we spoke in general terms about protectable interests in our opinion, and even noted, "[o]f course, a citizen's 'liberty' interest, in avoiding government infringement on his freedoms, also invokes due process protections." *Id.* at 690 n.12.

Article I, Section 5 provides: "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." PA. CONST. Art. I, §5. In *League of Women Voters*, we explained that "rather than a 'reaction' to federal constitutional jurisprudence," the Free and Equal Elections Clause "stands as a self-contained and self-governing body of constitutional law, and acts as a wholly independent protector of the rights of the citizens of our Commonwealth." 178 A.3d at 802. We emphasized the provision's place in Article I of our state Constitution, the Commonwealth's Declaration of Rights, "which spells out the social contract between government and the people and which is of such 'general, great and essential' quality as to be ensconced as 'inviolate.'" *Id.* at 803, *quoting* PA. CONST. art. I, Preamble & §25 ("[t]o guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate"). Interpreting the "plain and expansive sweep" of Article I, Section 5, we held it was "the framers' intent that all aspects of the electoral process, to the greatest degree possible, be kept open and unrestricted to the voters of our Commonwealth, and, also, conducted in a manner which guarantees, to the greatest degree possible, a voter's right to equal participation in the electoral process for the selection of his or her representatives in government." *Id.* at 804. "Stated another way, the actual and plain language of Section 5 mandates that all voters have an equal opportunity to translate their votes into representation." *Id.*

While the Free and Equal Elections Clause offers broad protections for voting rights, Article VII, Section 1 provides a more targeted, affirmative entitlement for qualified electors to "vote" subject to registration laws. That provision states:

Every citizen twenty-one[31] years of age, possessing the following qualifications, **shall be entitled to vote at all elections** subject, however, to such laws requiring and regulating the registration of electors as the General Assembly may enact.

1. He or she shall have been a citizen of the United States at least one month.

2. He or she shall have resided in the State ninety (90) days immediately preceding the election.

3. He or she shall have resided in the election district where he or she shall offer to vote at least sixty (60) days immediately preceding the election, except that if qualified to vote in an election district prior to removal of residence, he or she may, if a resident of Pennsylvania, vote in the election district from which he or she removed his or her residence within sixty (60) days preceding the election.

PA. CONST. art. VII, §1 (emphasis added). Notably, a near-exact replica of this Constitutional provision appears in the Election Code. *See* 25 P.S. §2811 (providing the same, except with an age threshold of "eighteen years" and a thirty-day residency/removal threshold in subsection 3).[32]

---

[31] The twenty-sixth amendment to the United States Constitution lowered the voting age to eighteen nationwide. *See* U.S. CONST. amend. 26.

[32] In full, Section 2811 states:

Every citizen of this Commonwealth eighteen years of age, possessing the following qualifications, shall be entitled to vote at all elections, provided he or she has complied with the provisions of the acts requiring and regulating the registration of electors:

(1) He or she shall have been a citizen of the United States at least one month.

(2) He or she shall have resided in the State ninety days immediately preceding the election.

(3) He or she shall have resided in the election district where he or she shall offer to vote at least thirty days immediately preceding the election, except that if qualified to vote in an election district prior to removal of residence, he or she may, if a resident of Pennsylvania, vote in the election district from which he or she

(continued…)

Recently, this Court considered Article VII, Section 1 and its statutory sister. *See In re Canvass of Provisional Ballots in the 2024 Primary Election*, 322 A.3d 900 (Pa. 2024) ("*In re Canvass (2024 Primary)*"). In that case, an elector bought a house in McAdoo, Schuylkill County, in June 2023, but he lived with family in Butler Township, Luzerne County, until March 29, 2024 (which was less than thirty days before the 2024 Primary Election). On the day of the Primary Election, the elector went to his polling place in Butler Township, where the poll workers could not find his name on the district register[33] but allowed him to cast a provisional ballot. The Luzerne County Board of Elections refused to count his provisional ballot, and the trial court affirmed, reasoning he could have voted in his new district in Schuylkill County. The Commonwealth Court reversed, citing Section 2811 of the Election Code.

We affirmed and held the elector's provisional ballot could be counted. As part of our reasoning, we noted the elector could not have lawfully voted in his new district pursuant to the residency requirement in Article VII, Section 1. "Moreover," we explained "his **entitlement** to vote in [his old district in] Butler Township was **guaranteed** by" 25 P.S. §2811(3). *Id.* at 912-13 (emphasis added). Although the elector "could not lawfully vote in two places in the same election," we continued, since "his residence changed 'within thirty days preceding the election,' he was '**entitled to vote**' in his old district." *Id.* at 913, *citing* 25 P.S. §2811(3); PA. CONST. art. VII, §1 (emphasis added). Also relevant here, we questioned the validity of "[a]ny administrative decision" by PennDOT or the

_____

removed his or her residence within thirty days preceding the election.

25 P.S. §2811.

[33] The elector had changed the address for his vehicle registration to the new McAdoo location in December 2023, and testified he believed PennDOT must have also changed his voter registration to Schuylkill County at that time, without his knowledge. *See In re Canvass (2024 Primary)*, 322 A.3d at 903.

Department of State "to transfer an elector's voter registration without that person's **affirmative consent**" based on the application to change the vehicle's registration, in the absence of an on-point statute or administrative regulation authorizing such act. *Id.* at 912 (emphasis added). Of course, this suggests the elector had some interest in his "entitlement" to vote in his district, which PennDOT could not take away or alter on a whim.

Having identified the constitutional sources of entitlement to vote in this Commonwealth, the question remains whether they implicate a liberty interest such that due process attaches. *See Bell*, 420 A.2d at 449 ("The determinative question is whether the litigant holds such a legitimate 'claim of entitlement[.]'"). We have no hesitation in concluding the right to vote constitutes a legitimate, protected liberty interest. Qualified electors have a "legitimate claim of entitlement," as their expectation the Pennsylvania Constitution entitles them to vote is patently "justifiable," "protectable," "sufficient," and "proper." *Id.* Indeed, not only is the right to vote guaranteed by the state Constitution; it also finds significant statutory support as an entitlement — in all its various forms. *See, e.g.*, 25 P.S. §3150.11(a) ("A qualified mail-in elector shall be entitled to vote by an official mail-in ballot in any primary or election held in this Commonwealth in the manner provided under this article."); 25 P.S. §3146.1 (describing those "persons [who] shall be entitled to vote by an official absentee ballot in any primary or election held in this Commonwealth"); 25 P.S. §3050(a.4)(4) (referring to provisional electors' "entitle[ment] to vote at the election district"). Electors' dependency and reliance on this constellation of affirmative constitutional and statutory promises is undoubtedly justifiable. *See Sweeney*, 375 A.2d at 713 ("Whether an interest is entitled to due process protections depends on the nature of the governmental activity and the citizen's dependency and justifiable reliance on that activity.").

Of course, one's liberty interest in the fundamental right to vote in this Commonwealth is not absolute. As we have repeatedly held, "[s]ubject to constitutional limitations, the Pennsylvania General Assembly may require such practices and procedures as it may deem necessary to the orderly, fair, and efficient administration of public elections in Pennsylvania." *In re Guzzardi*, 99 A.3d 381, 386 (Pa. 2014). Moreover, we do not today purport to define the full contours of the liberty interests attendant to the right to vote. For our purposes here, it is enough to say that a general liberty interest in voting springs from the dual provisions of our state charter discussed above and those statutes describing the various entitlements that accompany the right to vote. In reaching this conclusion, we join the legion of other courts that have determined the right to vote implicates liberty interests.[34]

---

[34] *See, e.g.*, *League of Women Voters of Kan. v. Schwab*, 549 P.3d 363, 383 (Kan. 2024) ("To comply with due process guarantees, any proper proofs devised by the Legislature must include reasonable notice to the voter and an opportunity to be heard at a meaningful time and in a meaningful manner by providing an opportunity to contest the disqualification of otherwise valid absentee ballots . . . ."); *Raetzel v. Parks Absentee Election Bd.*, 762 F. Supp. 1354, 1357 (D. Ariz. 1990) ("the right to vote is a 'liberty' interest which may not be confiscated without due process"); *see also Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 227 (M.D.N.C. 2020) ("The right to vote is a constitutionally protected liberty interest."); *Self Advocacy Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1052 (D.N.D. 2020) ("Beyond debate, the right to vote is a constitutionally protected liberty interest."); *Doe v. Rowe*, 156 F. Supp. 2d 35, 48 (D. Me. 2001) ("the Court bases its due process analysis on a finding that the denial of the right to vote is a denial of a fundamental liberty"); *Frederick v. Lawson*, 481 F. Supp. 3d 774, 792 (S.D. Ind. 2020) ("It is undisputed that the right to vote is a constitutionally protected liberty interest"); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) (accepted plaintiffs had "individual interest" in the right to vote for procedural due process inquiry, and while there is no fundamental right to vote by absentee ballot, "[h]aving induced voters to vote by absentee ballot, the State must provide adequate process"); *Zessar v. Helander*, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2006) ("[T]he in-person voter has a right to due process. . . . This Court finds that the state's action in creating an absentee voting program served to alter the rights of those electors who participate in the program. Accordingly, approved absentee voters are entitled to due process protection."); *La Follette v. Padilla*, 2018 WL 3953766, at *2 (Cal. Super. Mar. 05, 2018) ("due process protections apply to mailed votes just as they do to traditional ballots"). *Cf. United States v. Texas*, 252 F. Supp. 234, 250 (W.D. Tex. 1966) ("[I]t cannot be doubted that the right (continued…)

Here, however, we also need to consider the existence of a narrower liberty interest: namely, subject to the terms of the Election Code, do electors have a liberty interest in voting by provisional ballot where their mail-in ballot return packets were defective and the included ballots were thus void? Recently, in *Genser*, this Court confirmed "[p]rovisional ballots exist as a fail-safe to preserve access to the right to vote." *Genser*, 325 A.3d at 475. In that case, electors in Butler County were informed their mail-in ballot return packets had a disqualifying defect — they lacked secrecy envelopes (also known as "naked ballots") — when the county board entered a "CANC – No Secrecy Envelope" label into the SURE system. The electors then appeared at their polling places and cast provisional ballots. The county board refused to count the provisional ballots and did not count the defective mail ballots either. The trial court affirmed the board's decision, relying on the following provisions in Section 3050 of the Code:

> (5)(i) Except as provided in subclause (ii), if it is determined that the individual was registered and entitled to vote at the election district where the ballot was cast, the county board of elections shall compare the signature on the provisional ballot envelope with the signature on the elector's registration form and, if the signatures are determined to be genuine, **shall count the ballot** if the county board of elections confirms that the individual **did not cast any other ballot,** including an absentee ballot, in the election.

> (ii) A provisional ballot **shall not be counted** if:

> . . .

> (F) the elector's absentee ballot or mail-in ballot is **timely received** by a county board of elections.

25 P.S. §3050(a.4)(5) (emphasis added). On appeal, the Commonwealth Court reversed, finding an ambiguity existed when the above provisions were read in concert with 25 P.S. §3150.16(b) (discussed in more detail below).

---

to vote is one of the fundamental personal rights included within the concept of liberty as protected by the due process clause.").

After granting discretionary review, we affirmed. We held that when electors' mail ballots are void for failing to use a secrecy envelope, they have a "statutory right" to have their provisional ballot counted, but we did so based on different reasoning than the Commonwealth Court. *Genser*, 325 A.3d at 476. We decided the case based only on the provisional voting requirements in Section 3050(a.4), specifically focusing on the word "ballot." Initially, we recognized that in *Pa. Democratic Party*, we held a ballot submitted without a secrecy envelope was void and could not be counted. We explained "[t]he import of our holding in *Pa. Democratic Party* is clear: the failure to follow the mandatory requirements for voting by mail nullifies the attempt to vote by mail and the ballot." *Id.* at 479; *see also id.* at 479 n.29 (explaining in addition to the secrecy envelope, "signing and dating are likewise mandatory requirements to effectuate mail and absentee voting"). Mindful of that necessary context, we interpreted the provisions in 25 P.S. §3050(a.4).

Starting with subsection (a.4)(5)(i) (county board shall count provisional ballot if, *inter alia*, it "confirms that the individual did not cast any other ballot . . . in the election"), we explained the examination process for provisional ballots occurs after canvassing of all other ballots. We noted it is at that time the county boards "will know definitively" whether a returned mail ballot packet contains disqualifying defects "such that it is void." *Id.* at 480. We explained the above-quoted language in subsection (a.4)(5)(i) dictates when a provisional ballot can be counted, "serving the dual purpose of preventing a double vote while simultaneously protecting an elector's right to have a vote counted." *Id.* In *Genser*, where it was undisputed the electors' naked mail ballots had to be set aside and declared void, we determined such "void mail-in ballots cannot be afforded legal effect." *Id.* In line with subsection (a.4)(5)(i)'s requirement that the county board must confirm no other ballot is attributable to the individual elector before it counts their provisional ballot, we determined "[t]o construe a void ballot as a 'ballot . . . in the election'

is to give it legal effect, in direct contravention of our holding in *Pa. Democratic Party*[.]" *Id.*, *quoting* 25 P.S. §3050(a.4)(5)(i). Thus, once the Butler County Board of Elections determined the electors' naked ballots were void, it was required to count their provisional ballots.

Following that interpretation, we addressed subsection (a.4)(5)(ii)(F) (provisional ballot shall not be counted where "the elector's absentee ballot or mail-in ballot is timely received by a county board of elections"). We determined "[j]ust as a void ballot cannot be given legal effect in Subsection (a.4)(5)(i), it cannot be given effect in Subsection (a.4)(5)(ii)(F)." *Id.* at 481. Since the electors' naked mail ballots were void, "as a matter of law, no ballot was received by eight o'clock P.M. on Election Day and thus Subsection (a.4)(5)(ii)(F) was not triggered[,]" and the board could not on that basis refuse to count the electors' provisional ballots. *Id.*; *see id.* (noting subsection (a.4)(5)(ii)(F) turns on timely receipt of a "ballot," not a declaration envelope). We further explained these subsections work in tandem "to prevent the untenable result of permitting an elector to have the votes on two ballots counted." *Id.* at 483. And we rejected the appellants' arguments that the legislature's intent could be effectuated only if both the void mail ballot and the provisional ballot were discarded; that interpretation, we said, "ignores the availability of provisional voting and manufactures an absurdity whereby we must accept that the General Assembly intended to wholly disenfranchise a voter on account of a mistake with their Return Packet for no discernable purpose." *Id.*

Our core determinations in *Genser*, based on our prior holdings, were that a submitted mail-in ballot packet that fails to satisfy the mandatory requirements of the Election Code is a legal nullity and that qualified electors have a statutory right to have

their provisional ballots counted if no other ballot can be legally attributed to them.[35]  We address here an issue not before the Court in *Genser*: the eligibility to cast a provisional ballot in the context of a due process challenge.

---

[35] The principal dissent claims we "take[] liberty with this Court's ruling in *Genser*," noting *Genser* dealt with naked mail ballots only, and declared them "'void' under Section 1308(g)(4)(ii) of the Election Code, 25 P.S. §3146.8(g)(4)(ii)."  Dissenting Op. at 2 (Brobson, J.).  Respectfully, this is a selective reading of *Genser*, in which a majority of this Court plainly held "the failure to follow the mandatory requirements for voting by mail nullifies the attempt to vote by mail and the ballot."  325 A.3d at 479; *see also id.* at 479 n.29 (noting the signing and dating requirements, like the secrecy envelope requirement, are mandatory).  While it is true naked ballots were at issue in *Genser*, 25 P.S. §3146.8(g)(4)(ii) was not the only legal authority for our holding that such ballots are "void."  Indeed, Section 3146.8(g)(4)(ii) does not expressly deal with naked ballots; that provision is part of the statute outlining canvassing procedures, and specifically pertains to situations where the secrecy envelope contains "any text, mark or symbol which reveals the identity of the elector, the elector's political affiliation or the elector's candidate preference[.]"  25 P.S. §3146.8(g)(4)(ii).  Instead, we discussed that provision in the context of our decision in *Pa. Democratic Party*, where we read the secrecy envelope requirement in Section 3150.16(a) *in pari materia* with Section 3146.8(g)(4)(ii), as part of our analysis in determining the secrecy envelope requirement is mandatory.

Contrary to the principal dissent's suggestion *Genser* merely transplanted the word "void" from Section 3146.8(g)(4)(ii) to the naked ballot context, our determination in that case was more deeply rooted in this Court's longstanding precedent holding the failure to follow **mandatory** provisions of the Election Code renders the noncompliant action void.  Namely, in addition to *Pa. Democratic Party*, we also relied on our decisions in *In re. Nomination Papers of American Labor Party*, 44 A.2d 48 (Pa. 1945), and *In re Canvass of Absentee Ballots of Nov. 4, 2003 General Election (Appeal of Pierce)*, 843 A.2d 1223 (Pa. 2004).  In *American Labor Party*, we considered a requirement that challengers of nomination petitions serve a copy of their petition to set aside upon the relevant county board of elections.  Determining the service requirement was mandatory rather than directory, we explained "[a] mandatory provision is one the failure to follow which **renders the proceeding to which it relates illegal and void**.  A directory provision is one the observance of which is not necessary to the validity of the proceeding." *American Labor Party*, 44 A.2d at 49 (emphasis added).  Similarly, in *Appeal of Pierce*, we held an "in person" delivery requirement for absentee ballots was mandatory and "the absentee ballots of non-disabled persons who had their ballots delivered in contravention of this mandatory provision are void."  843 A.2d at 1234 (citing *American Labor Party* for the proposition an "act done in violation of [a] mandatory provision is void").  This proposition of law, relied upon by the Court in both *Pa. Democratic Party* and *Genser*, existed well before the General Assembly enacted Act 77's mandatory provisions in 2019, and we can presume the General Assembly knew the impact of employing such mandatory provisions (continued…)

As we have explained, the Help America Vote Act (HAVA) "establishes the framework and minimum requirements for provisional ballots." *Id.* at 473. Specifically, HAVA provides: "If an individual declares that such individual is a registered voter in the jurisdiction in which the individual desires to vote and that the individual is eligible to vote in an election for Federal office, but the name of the individual does not appear on the official list of eligible voters for the polling place **or an election official asserts that the individual is not eligible to vote**, such individual shall be permitted to cast a provisional ballot[.]" 52 U.S.C. §21082(a) (emphasis added); *see Genser*, 325 A.3d at 473 ("HAVA creates a right to **cast** a provisional ballot — but not to have it **counted**.") (citation omitted) (emphasis in original). Our General Assembly amended the Election Code in 2002 "to accommodate HAVA's provisional voting requirement." *Genser*, 325 A.3d at 473; *see id.* at 475 ("our General Assembly implemented HAVA's mandate in 2002, long before Act 77 amended the code to permit no-excuse mail-in voting"). Thus, "the casting of a provisional ballot is specifically authorized in the Election Code . . . as a fail-safe to preserve access to the right to vote." *Id.* at 475; *see also In re Canvass (2024 Primary)*, 322 A.3d at 905 ("When an elector arrives at the polling place, if there is any doubt about his eligibility to vote, he may cast a provisional ballot.").

When enacting Act 77, the General Assembly specifically tied the ability to vote by provisional ballot for mail-in (and absentee) electors to whether the elector had "voted" — not just to whether the elector **returned** a mail-in ballot return packet.[36] Specifically, 25

---

in the Election Code. *Cf.* 1 Pa.C.S. §1922 ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used: . . . That when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language.").

[36] To reiterate, the relevant language of Section 3150.16 was enacted as part of Act 77 in 2019 and thereafter, but the relevant language establishing provisional voting was adopted in 2002 to incorporate HAVA's requirements. *See Genser*, 325 A.3d at 477 n.28. (continued…)

P.S. §3150.16(b) (the other provision relied on by the Commonwealth Court in *Genser*) provides, in relevant part:

(1) Any elector who receives and **votes** a mail-in ballot under [25 P.S. §3150.11] shall not be eligible to **vote at a polling place** on election day. The district register at each polling place shall clearly identify electors who have received and **voted** mail-in ballots as ineligible to vote at the polling place, and district election officers shall not permit electors who **voted** a mail-in ballot to **vote at the polling place**.

(2) An elector who requests a mail-in ballot and who is not shown on the district register as having **voted** may **vote by provisional ballot** under [25 P.S. §3050](a.4)(1).

(3) Notwithstanding paragraph (2), an elector who requests a mail-in ballot and who is not shown on the district register as having **voted** the ballot may **vote at the polling place** if the elector remits the ballot and the envelope containing the declaration of the elector to the judge of elections to be spoiled and the elector signs a statement subject to the penalties of 18 Pa.C.S. §4904 (relating to unsworn falsification to authorities) which shall be in substantially the following form:

I hereby declare that I am a qualified registered elector who has obtained an absentee ballot or mail-in ballot. I further declare that I have not cast my absentee ballot or mail-in ballot, and that instead I remitted my absentee ballot or mail-in ballot to the judge of elections at my polling place to be spoiled and therefore request that my absentee ballot or mail-in ballot be voided.

(Date)

(Signature of Elector) ........... (Address of Elector)

(Local Judge of Elections)

25 P.S. §3150.16(b) (emphasis added). We observe this provision distinguishes between "vot[ing] at the polling place," and "vot[ing] provisionally," suggesting they mean different things: "vote at the polling place" refers to voting by usual methods in person at the polling

Act 77's addition of a provision establishing provisional voting for a category of voters, though it uses different formats and phrases, evidences an effort to incorporate HAVA's provisional voting requirements into the mail-in voting statutory scheme.

place on Election Day, and does not encompass the separate process of voting provisionally.

The statute thus establishes the following scheme: an elector who "votes" their mail-in ballot cannot vote by the county's normal methods on Election Day at their polling place. *Id.* at §3150.16(b)(1). Further, electors who have received but not "voted" their mail-in ballots have the option to either vote provisionally or remit them (to have the mail-in ballot "spoiled" or "voided") and vote normally at their polling place (subject to making the required declaration). *Id.* at §3150.16(b)(2)-(3). Finally, an elector who "requests" a mail-in ballot but submits one without a secrecy envelope or the mandatory signing and dating requirements on the declaration envelope has submitted a defective, void ballot that cannot be given legal effect. *See Genser*, 325 A.3d at 480; *see also id.* at 479 n.29 (in addition to the secrecy envelope mandatory requirement, "[p]ursuant to Sections 3150.16(a) and 3146.6(a), signing and dating are likewise mandatory requirements to effectuate mail and absentee voting"). If a voter has not used the secrecy envelope or met the mandatory requirements for the declaration envelope, this invalidates the attempt at mail-in voting and the ballot itself. *See id.* at 480. Treating the void mail-in ballot as a "voted" ballot would be giving it legal effect, which the law prohibits. Therefore, an elector who "requests" a mail-in ballot but submits a void one has not "voted," and subsection (b)(1) does not apply. However, those electors did "request[ ] a mail-in ballot," and are therefore subject to the requirements in subsections (b)(2) and (b)(3). And since they already sent back their return packets to the county, they obviously would not be able to "remit[] the ballot and the envelope containing the declaration" (*i.e.*, the return packet) under subsection (b)(3). 25 P.S. §3150.16(b)(3). So their only avenue to vote (if the submitted mail-in ballot is void) is through subsection (b)(2)'s explicit grant of the ability

to vote by provisional ballot.[37]  The provisional voting section in Act 77 thus deals with casting a provisional ballot and directs the failed mail-in voter to the procedures for casting a provisional ballot, 25 P.S. §3050(a.4)(1).  It articulates the statutory right of a voter who unsuccessfully attempted to vote by mail to cast a provisional ballot.[38]

This focus on whether an elector "voted" is further reflected in the notice that must be included in the mail-in ballot packet: "The official mail-in voter ballot shall state that a voter who receives a mail-in ballot . . . and whose **voted** mail-in ballot is not timely received may only vote on election day by **provisional ballot** unless the elector brings the elector's mail-in ballot to the elector's polling place, remits the ballot and the envelope containing the declaration of the elector to the judge of elections to be spoiled and signs a statement subject to the penalties of 18 Pa.C.S. §4904 (relating to unsworn falsification to authorities) to the same effect."  25 P.S. §3150.13(e) (emphasis added).  Notably, the word "voted" was added by Act 12 of 2020; previously it stated "whose mail-in ballot is not timely received."  Act of Mar. 27, 2020, P.L. 41 N. 12, §13(e) (amending 25 P.S. §3150.13).

---

[37] *Accord* Pa. Dep't of State, *Guidance Concerning Civilian Absentee and Mail-in Ballot Procedures, Version: 3.1*, at 10 (Sept. 10, 2024), *available at* https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-elections/directives-and-guidance/2024-guidance-civilian-absentee-mail-in-ballot-procedures-v3.1.pdf ("[F]or voters whose voted absentee or mail-in ballot has been received, the poll book record will indicate that their mail ballot was returned.  This will aid poll workers when checking in voters to easily determine that these voters are not eligible to vote on the voting equipment, but they may vote provisionally if they believe they are eligible to vote.").

[38] To be clear, our conclusion that electors who timely submit mail-in ballot return packets with disqualifying defects have not "voted" does not mean such electors are permitted to vote in the booth on Election Day under subsection (b)(1).  Such electors are limited to voting provisionally since they are necessarily unable to remit the mail ballot and declaration envelope in accordance with (b)(3).

In sum, "the failure to follow the mandatory requirements for voting by mail" — including the mandatory signing and dating provisions — "nullifies the attempt to vote by mail and the ballot." *Genser*, 325 A.3d at 479. Importantly, however, "the casting of a provisional ballot is specifically authorized in the Election Code[,]" *id.* at 475, and electors retain that right even if they submit a defective mail-in ballot return packet. Thus, we conclude the statutory entitlement to vote provisionally plainly establishes a liberty interest. *See Thompson*, 490 U.S. at 460 ("an individual claiming a protected interest must have a legitimate claim of entitlement to it"); *Bell*, 420 A.2d at 449 ("Claims of entitlement spring from expectations that are 'justifiable,' . . . 'protectable,' . . . 'sufficient,' . . . or 'proper.'").[39]

---

[39] We acknowledge the reality of the statutory scheme, which refers to a notation in the district register of whether a mail-in elector has "voted" prior to Election Day. As we have explained, the final determination of whether an elector has voted a non-void "ballot" is made during the pre-canvass and canvass. *See Genser*, 325 A.3d at 482. Accordingly, the district registers generated by the SURE system do not explicitly indicate an elector has "voted," but only that the mail-in ballot packet was returned or "cast," along with a notation the elector is "not eligible." *See* N.T. 8/5/24 at 11-12 (district register shows mail ballot was returned and elector is "ineligible"); Joint Stipulation, Ex. J, at 3 ("Mail-in – Ballot Cast/Not Eligible"); *accord* Joint Stipulation, Ex. I (Department "Guidance Concerning Examination of Absentee and Mail-in Ballot Return Envelopes") (4/3/23), at 3 (explaining county board "is responsible for approving ballots to be counted during pre-canvassing and canvassing[,]" and "[i]f the board determines that a ballot should not be counted, the **final** ballot disposition should be noted in SURE") (emphasis added). But a provisional ballot is always available if eligibility is in question. *See, e.g.*, 25 P.S. §3050(a.4)(1); *In re Canvass (2024 Primary)*, 322 A.3d at 905 ("When an elector arrives at the polling place, if there is any doubt about his eligibility to vote, he may cast a provisional ballot."); *accord* 52 U.S.C. §21082 ("[i]f . . . an election official asserts that the individual is not eligible to vote, such individual shall be permitted to cast a provisional ballot"); U.S. Election Assistance Commission, *EAC Best Practices: Provisional Voting*, at 1 (July 2, 2023) ("HAVA expanded and standardized the use of provisional voting as a way to cast a ballot when: . . [t]here is some indication that the voter may have already cast another ballot (e.g., by mail)"). Moreover, the Department of State's guidance aligns with this statutory scheme, providing "[v]oters are entitled to a provisional ballot when their eligibility to vote is uncertain[,]" including when the "[v]oter was issued an absentee or mail-in ballot but believes that they did not successfully vote the ballot[,]" and where the "[v]oter returned a completed absentee or mail-in ballot [return packet] that will be rejected by the county (continued…)

Unlike the lower courts, however, we are not convinced a pre-Election Day liberty interest emanates from 25 P.S. §3157 (allowing "[a]ny person aggrieved by any order or decision of any county board regarding the computation or canvassing of the returns of any primary or election . . . [to] appeal therefrom within two days after such order or decision shall have been made"). More to the point, since appellees did not raise Section 3157 in their complaint, and they do not presently claim that statute creates a relevant liberty interest, we decline to hold that it does, or to make any merits determination on the operation of that statute in this context. *See* Appellees' Brief at 25 n.11 ("this Court does not even need to reach the question"). We therefore vacate the lower courts' decisions to the extent they could be read as requiring the availability of pre-Election Day challenges to ballot segregation, canvassing, or computation decisions under Section 3157. But we affirm those decisions' conclusion that the statutory right to vote by provisional ballot creates a liberty interest implicating procedural due process.

We now consider whether the government — in the guise of the Board — "interfered" with these liberty interests. *Turner*, 80 A.3d at 764. We hold that it did. Under the Board's 2024 Primary Election policy requiring entry of the same SURE code for all

---

board of elections, and the voter believes they are eligible to vote." Joint Stipulation, Ex. J, at 1. By the same token, electors who have in fact "voted" are still precluded from "vot[ing] at the polling place," *i.e.*, by the county's normal method rather than by provisional ballot. As we have seen, in Washington County, "[a]ll voters or anyone can vote a provisional ballot" on Election Day, even someone who had earlier returned a mail-in ballot packet with a disqualifying error. Ostrander Dep. at 89. Given these realities, we appreciate the Secretary's position that the trial court's directive regarding poll book entries is unnecessary. *See Amicus* Brief of Sec'y Al Schmidt & Dep't of State at 6-7; Trial Court Op. and Order, 8/23/24, at 4 (Board "is hereby ordered to properly document in the poll books that the elector has not 'voted' when an elector's mail-in packet is segregated for a disqualifying error"). We view this portion of the injunction as a reasonable attempt to account for the above statutory language, and we therefore do not disturb it. To be clear, however, so long as the Board does not enter anything in the district registers that interferes with the right of electors who submit void defective mail-in ballots to vote provisionally, the Board will be in compliance with the law.

received mail-in ballot return packets, electors had no way of knowing their ballots were segregated for a disqualifying defect and that they had not actually cast a "vote" that would be counted (*i.e.*, one that was not void); in fact, they were led to believe the opposite. This is because the Board marked "Record – Ballot Returned" for all electors who timely submitted their return packets — fatal defects or not. *See* Ostrander Dep. at 71 ("The Board of Elections informed me that all [return packets] would be coded as . . . ballot returned in the SURE system."); *id.* at 73 ("all ballots received by our office were scanned in the [SURE] system with the code record ballot returned" "on the same day that the ballot was returned"). This, in turn, triggered a SURE email to the elector confirming the Board's receipt of the return packet and stating:

> If your county election office identifies an issue with your ballot envelopes that prevents the ballot from being counted, **you may receive another notification**. **Otherwise**, you will not receive any further updates on the status of your ballot and you are no longer permitted to vote at your polling place location.

Joint Stipulation, Ex. D, at 10 (emphasis added). In Director Ostrander's own words, "[b]ased upon the decision made by the [Board], that sentence is misleading" because the Board did not intend to send "another notification" to voters who submitted return packets with disqualifying errors. Ostrander Dep. at 163.[40] And the "may" in that sentence could easily be read as conditioned upon whether the "election office identifies an issue with [the] ballot envelopes[,]" rather than based on Board policy. Joint Stipulation, Ex. D, at 10.

Additionally, those electors who received and then sent in defective return packets were **affirmatively misinformed** that they were no longer permitted to vote at their polling place, even though that was not true, as they still could have voted by provisional ballot.

---

[40] To be clear, we do not suggest Director Ostrander personally attempted to mislead electors.

*See Genser*, 325 A.3d at 475 (recognizing "right to cast a provisional ballot"); *see also* Ostrander Dep. at 89 ("[a]ll voters or anyone can vote a provisional ballot" on Election Day, even someone who had earlier returned a defective mail-in ballot).[41] After submitting their return packets, which Washington County coded each time in SURE as "Record – Ballot Returned," the electors were misled by an email informing them they were "no longer permitted to vote at [their] polling place location." Joint Stipulation, Ex. D, at 10. What's more, the Board knew that "the SURE CODE" it instructed its staff "to use would have determined which email was generated to the voter." Ostrander Dep. at 67. In other words, the Board was fully aware of the consequences of its decision to instruct its staff to only enter a generic "Record – Ballot Returned" code: the vague coding guaranteed an automatic email notice from the state to electors misinforming them they were ineligible to vote provisionally on Election Day. On the other hand, had the Board used the more specific "CANC" codes, it would have triggered an email correctly alerting the electors they could "go to [their] polling place on election day and cast a provisional ballot." Joint Stipulation, Ex. D, at 6-9.[42]

---

[41] Director Ostrander explained Washington County allows anyone to fill out a provisional ballot, in accordance with Department of State guidelines. *See* Ostrander Dep. at 215 ("Any voter, even a nonregistered voter, anyone can vote a provisional ballot."); *accord* Joint Stipulation, Ex. J, at 1 ("The circumstances which would create a situation where a voter may be issued a provisional ballot include": "Voter was issued an absentee or mail-in ballot but believes that they did not successfully vote the ballot, and the [return packet was] not surrendered at the polling place to be spoiled"; "Voter returned a completed absentee or mail-in ballot that will be rejected by the county board of elections, and the voter believes they are eligible to vote."). But she also stated that if a return packet "had a disqualifying error and the[ elector] went to the poll and voted a provisional ballot, that provisional ballot **would not be counted** if we had a ballot marked as received[.]" Ostrander Dep. at 215 (emphasis added). That position is directly at odds with our recent holding in *Genser*, and here.

[42] We do not assert "the Board ha[d] authority to cancel or disqualify a ballot under the Election Code prior to the pre-canvassing and canvassing process." Dissenting Op. at 4 (Brobson, J.). The SURE codes do not serve as a final judgment on the validity of a mail-in ballot, and they can be updated after the pre-canvass and canvass. *See* 25 Pa.C.S. (continued…)

Certainly, these actions impeded the ability of those electors to exercise their right to vote by way of provisional ballot, since they were led to believe they successfully voted their mail ballot and had no need to vote provisionally.[43] In fact, all the appellee-electors averred they would have attempted to vote a provisional ballot had they known their mail-in ballot return packet was segregated for a disqualifying error during the Primary

§1222(c)(4) ("The SURE system shall . . . [p]ermit the commissions to add, modify and delete information in the system as is necessary and appropriate."); *see also* Marks Dep. at 61-62 ("[W]e have to distinguish here between recording things in the SURE system and the official canvass. . . . [I]f a county, for example[,] recorded a ballot as canceled in the SURE system, but subsequently the voter was able to correct that, there's nothing that would prevent the county from updating that disposition if necessary."). We recognize, however, the emails triggered by the "CANC" codes also were not perfect. For instance, the "CANC – Incorrect Date" code triggered an email stating: "Your mail ballot may not be counted because you did not correctly date the declaration on your ballot return envelope. If you do not have time to request a new ballot before [Ballot Application Deadline Date], or if the deadline has passed, you can go to your polling place on election day and cast a provisional ballot." Joint Stipulation, Ex. D, at 8. Of course, under the Board's April 2024 policy, Washington County would not have granted any such request for a new ballot. But contrary to the principal dissent's assertion that the "CANC" codes "would not have provided the affected electors with any relief," Dissenting Op. at 4 (Brobson, J.), the triggered email would have provided the electors the critical notice that their ballot likely would not be counted because of the identified defect, and that they still had the opportunity to cast a provisional ballot (which **was** allowed in Washington County, even before *Genser*). *See* Ostrander Dep. at 215 ("anyone can vote a provisional ballot").

[43] Given the fact Washington County already permitted "anyone [to] vote a provisional ballot," Ostrander Dep. at 215, which complied with the Department's Guidelines on Provisional Voting, *see* Joint Stipulation, Ex. J, as well as the plain text of HAVA, *see* 52 U.S.C. §21082(a), we respectfully disagree with the principal dissent that the Board would have needed "Nostradamus-like powers" to know its conduct was misleading. Dissenting Op. at 5 (Brobson, J.). The Board did not need the benefit of our decision in *Genser* to know electors, even those who sent back defective return packets, could fill out a provisional ballot on Election Day under then-existing law and practices in Washington County. Moreover, pursuant to its own 2024 Primary Election policy, the Board certainly knew those electors would **not** "receive another notification" from the Board if a defect were discovered, contrary to the email generated for all electors. Thus, the Board should have realized its decision would mislead electors — no clairvoyance was required.

Election.  *See* Joint Stipulation at ¶¶9-15.  All things considered, we find appellees have sufficiently demonstrated the government interfered with their right to vote provisionally.[44]

### 2. *Mathews* Balancing – What Process Is Due?

Having determined the lower courts correctly concluded this case involves liberty interests with which the state has interfered, we now turn to step two of the procedural due process analysis — determining "whether the procedures attendant to th[e] deprivation were constitutionally sufficient."  *Turner*, 80 A.3d at 764.  At this stage, we apply the *Mathews* test, and balance: "(1) the private interest affected by the governmental action; (2) the risk of an erroneous deprivation together with the value of additional or substitute safeguards; and (3) the state interest involved, including the administrative burden the additional or substitute procedural requirements would impose on the state."  *Bundy*, 184 A.3d at 557.

### a. Private Interests Affected

Appellants do not raise a separate argument pertaining to this factor, which overlaps to some extent with the analysis of whether a protectable interest exists in the first place.  Appellees, however, stress "[i]t is undeniable that the loss of the right to vote goes to the heart of what it means to be a citizen of the Commonwealth of Pennsylvania[,]"

---

[44] Although we acknowledge the principal dissent's well-taken point that "the programming of the SURE system to generate emails based on codes entered by county boards of elections and the contents of those emails were within the exclusive control of the Department and not the Board or any county board of elections for that matter[,]" Dissenting Op. at 9 (Brobson, J.), this changes nothing from a constitutional standpoint. We all agree the government — be it the Board, the Department, or any other Commonwealth entity — should not mislead electors as to where they stand.  Moreover, it appears we all agree the emails received by electors in Washington County were inaccurate and would not have been sent but for the actions of multiple government officials.  That is what matters for purposes of the due process question before us, not which official is most at fault.

and they conclude "[t]he private interest at stake here is of the utmost importance." Appellees' Brief at 29.

As explained above, the private interests affected here were the statutory entitlement to vote by a provisional ballot, within the broader context of our Commonwealth's constitutional voting provisions. Even appellants do not contest that the right to vote is fundamental. Nor could they reasonably do so; as we have described it, "the right of suffrage is the most treasured prerogative of citizenship." *Appeal of Norwood*, 116 A.2d 552, 553 (Pa. 1955); *see also Bergdoll*, 731 A.2d at 1269 ("The right to vote in any election is a personal and individual right, to be exercised in a free and unimpaired manner, in accordance with our Constitution and laws. The right is pervasive of other basic civil and political rights, and is the bed-rock of our free political system.") (internal quotation and citation omitted). The United States Supreme Court has likewise explained, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Needless to say, the right to vote is more than just important — in this Commonwealth, it is "sacred." *Page v. Allen*, 58 Pa. 338, 347 (Pa. 1868). Thus, we hold the value of the liberty interests involved weighs in appellees' favor for purposes of the first factor.

**b. Risk of Erroneous Deprivation & Value of Substitute or Additional Safeguards**

As for the second *Mathews* factor, appellants argue that even if the Court finds a cognizable liberty interest, the Board already provided all the process that was due. Appellants further contend the panel majority failed to demonstrate the value of additional or substitute safeguards, explaining "[w]here existing procedures already provide ample notice and process, additional safeguards have little, if any, value." Appellants' Brief at

They describe the "fulsome instructions" and warnings for consequences of noncompliance, and argue "'[s]o long as the Secretary and the county boards of elections provide electors with adequate instructions for completing the declaration of the elector — including conspicuous warnings regarding the consequences for failing strictly to adhere — pre-deprivation notice is unnecessary' **before a county board declines to count a mail ballot** due to noncompliance with the General Assembly's ballot-casting rules." *Id.* at 32, *quoting Pa. Democratic Party*, 238 A.3d at 389 (Wecht, J., concurring) (emphasis added). Appellants assert the thorough instructions are "adequate" and "conspicuous," and appellees have not attempted to show otherwise (or that the Board even made a mistake in rejecting their mail ballots), undermining the lower courts' findings of a "clear right" to injunctive relief. *Id.* at 32-34.

Appellants further claim the panel majority failed to consider the procedural protections provided through the canvass. Specifically, they explain under Section 3153 of the Code, the Board "arrange[s] for the computation and canvassing of the returns of votes" at a "convenient public place" with "adequate accommodations" for "watchers and attorneys" to "witness the proceedings." *Id.* at 34, *quoting* 25 P.S. §3153. They also note the Board "**publicly** commence[s] the computation and canvassing of the returns" and gives "due notice" of the event. *Id.*, *quoting* 25 P.S. §3154 (emphasis supplied by appellants). Appellants aver the Board followed these procedures for the 2024 Primary Election, and none of the appellees attended the canvass or preserved any objections. They argue these canvassing processes, in turn, would have given electors adequate notice of their Section 3157 right to appeal the Board's decision not to count their mail ballots, satisfying any procedural due process concerns regarding the appeal right.

Appellees respond this factor weighs heavily in their favor. In their view, without notice regarding the Board's segregation of their mail-in ballot return packets for

disqualifying errors, "deprivation is certain." Appellees' Brief at 30 (capitalization omitted). They argue the Board precluded the notice necessary for electors to protect their rights, explaining "[t]he Board's handling of mail-in ballots and misuse of the SURE system results in the kind of 'secret, one-sided determination of facts decisive of rights' that this Court has condemned as violative of due process." *Id., quoting Washington*, 306 A.3d at 266. According to appellees, "disenfranchisement is a foregone conclusion," as proven by the fact that not one elector who made a disqualifying error on their mail-in ballot return packet in the 2024 Primary Election voted by provisional ballot or attended the official canvass. *Id.*

On the flip-side, they explain, the Board is well positioned to provide additional safeguards. Appellees observe the Board already selects a SURE code for each mail-in ballot return packet; "all [they] ask is that the Board continue entering an accurate code." *Id.* at 31. They explain that doing so triggers an email alerting electors that their return packet has a potential error and that they can go to their polling place on Election Day to vote provisionally. Meanwhile, appellees cast appellants' proposed alternatives as illusory. They suggest the fact that "tens of thousands of Pennsylvanians" have had their mail ballots disqualified in recent years "makes plain that the instructions on the mail ballot envelope are woefully insufficient[.]" *Id.* at 33. As well, they refute appellants' argument that the public canvass provides the requisite process, noting it comes too late for electors to preserve their fundamental right to vote by voting a provisional ballot.

Considering these arguments, we hold the risk of erroneous deprivation of the right to vote posed by the Board's 2024 policy is high, while the value of additional safeguards — accurate coding in SURE — would be great. As noted above, if all mail-in electors are told, "you are no longer permitted to vote at your polling place location," there will necessarily be erroneous deprivations of those who are still permitted to vote a provisional

ballot, *i.e.*, those who submitted ballots with disqualifying defects. Joint Stipulation, Ex. D, at 10.[45]

Regarding the value of additional safeguards, we have explained that "[i]n terms of the right to be heard at a meaningful time, the second *Mathews* element reflects that avoiding erroneous deprivations before they occur is an important concern under the Due Process Clause." *Bundy*, 184 A.3d at 557. "There is thus a general preference that procedural safeguards apply in the pre-deprivation timeframe[,]" but where pre-deprivation process is not feasible, "the availability of a meaningful post-deprivation remedy satisfies due process." *Id.* In this case, the value of pre-deprivation process would far exceed the value of post-deprivation process. Perhaps most critically, if electors who are eligible to vote by provisional ballot do not do so on Election Day, that right is irretrievably lost — no post-deprivation process could rescue their votes. Thus, post-deprivation process would not be "meaningful." *Id.* It would, in fact, be meaningless. By contrast, even minimal pre-deprivation process (*i.e.*, providing accurate notice through the SURE system) would alleviate the concern, as electors would know whether they have an ongoing right to vote provisionally, and they would be able to go to the polls on Election Day to salvage their vote if they so choose. *See Pa. Coal Mining Ass'n*, 370

---

[45] Appellants' argument incorrectly assumes the relevant deprivation is the rejection of the mail-in ballot itself. But appellees have not questioned the Board's authority to reject a mail-in ballot where the elector has failed to comply with the Election Code's mandatory requirements, and they are not asking to have defective mail-in ballots counted. *See* Appellees' Brief at 37 ("Appellees are simply asking that the Board enter the proper codes from a drop-down menu in SURE."). And, to be crystal clear, this Court is **not** ordering the Board to **count** mail ballots with disqualifying defects. *See, e.g.*, *Genser*, 325 A.3d at 482 ("Certainly, the requirements of the Election Code will occasionally result in a vote not being counted when an elector fails to follow the rules for voting by mail ballot."); *Ball v. Chapman*, 289 A.3d 1, 22 (Pa. 2023) (reaffirming "ballots must be dated, and that failure to provide a date would result in disqualification"); *Pa. Democratic Party*, 238 A.3d at 380 ("a mail-in ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified").

A.2d at 692 ("Without notice, [individuals] cannot take advantage of any of the other procedural safeguards made available to [them].").[46]

### c. State Interest Involved

Finally, in terms of the third *Mathews* factor, appellants argue the relief ordered by the lower courts imposes a significant and unjustified administrative burden on the Board. They claim that to comply with the mandate, the Board would have to decide the validity of mail-in ballots and publish those results before Election Day, which they argue violates the Code. Additionally, they suggest electors would receive differential treatment based on when they submit their mail-in ballot return packets, which they claim could potentially violate equal protection or uniformity principles under the state and federal Constitutions. Appellants aver "the Board ha[d] no way to ensure that the lower courts' 'amorphous' commands to give an opportunity to contest invalid ballots will be 'implemented and fairly administered[.]'" Appellants' Brief at 37, *quoting Pa. Democratic Party*, 238 A.3d at 389

---

[46] The dissent questions the value of any additional safeguards pertaining to the SURE system since "electors are not required to provide their email addresses when applying for a mail-in ballot, and not all electors have home internet access and the ability to readily access their email." Dissenting Op. at 1 (Mundy, J.). We observe that while this opinion focuses primarily on the emails triggered by the SURE codes, the coding also impacts the information in the online mail-ballot status tracker. *See* Joint Stipulation at ¶24 ("When the county election office selects the 'cancelled' or 'pending' code into the SURE system, both the automatic email sent through the SURE system and [the Department's] mail-ballot tracker inform the elector that their mail-in ballot has a disqualifying error."); Joint Stipulation, Ex. D, at 6 (explaining the language in the triggered email "will also appear on the [PA Voter Services] Election Ballot Status Tracker[.]"). Thus, even for those electors who choose not to provide an email address when they register to vote, they are still able to see the status of their ballot and the attendant explanation on the tracker, which is publicly available on the internet. *See* Election Ballot Status Form, DEP'T OF STATE, https://www.pavoterservices.pa.gov/pages/ballottracking.aspx (last visited Sept. 24, 2025) (requiring only first and last name, date of birth, and elector's county). Moreover, while it may be true that not all electors have "home internet access," Dissenting Op. at 1 (Mundy, J.), we note the internet is available in places other than one's own home. For instance, the internet is also accessible in a variety of public spaces such as libraries, community centers, schools, stores, restaurants, cafes, and transit stations, among others.

(Wecht, J., concurring). Even if the lower courts' mandate is read as a post-election notice requirement, appellants assert "[i]t is unclear how the Board is supposed to provide notice of mail ballot defects after the election, other than the ample procedures electors are **already** provided through the public canvassing process." *Id.* (emphasis in original) (explaining the panel majority rejected the suggestion the Board could provide a list of electors who submitted rejected mail ballots).

Appellees argue the third *Mathews* factor also weighs in their favor, determining the burden on the Board of entering accurate codes into the SURE system is minimal. They highlight the Board itself has not challenged the lower courts' orders as burdensome, and appellants fail to establish any error in the trial court's findings. Appellees emphasize the Board provided accurate notice in the 2023 election, it was already obligated to use the SURE system for tracking mail-in ballots, *see* Appellees' Brief at 35, *citing* 25 Pa.C.S. §1222, 25 P.S. §3150.16(b)(1), and 4 Pa. Code §183.4(b)(2), and the Board had already resumed entering accurate SURE codes pursuant to the injunction. Appellees stress the only modification to the Board's operations is that it is now required to select an accurate code from the SURE drop-down menu, which appellees contend fulfills the procedural due process requirements. *See id.* at 36 (noting the relief requested is not "amorphous" and that a majority of Pennsylvania counties do the same). Moreover, appellees dispute that notifying electors of problems with mail-in ballot return packets would lead to differential treatment, explaining the trial court's order applied to all Washington County electors the same by requiring the Board to enter accurate codes for everyone. Appellees acknowledge the "date of notice will be correlated to the date when the voter returns the ballot," but they state "that is hardly a constitutional infirmity." *Id.* at 36 n.13.

We hold the "state interest involved, including the administrative burden the additional or substitute procedural requirements would impose[,]" is outweighed by the first two *Mathews* factors. *Bundy*, 184 A.3d at 557. Certainly, the government has "'important regulatory interests' in orderly elections, and those interests are sufficient to justify the enforcement of reasonable, nondiscriminatory rules governing . . . the voting process." *In re Canvass (2024 Primary)*, 322 A.3d at 907, *quoting Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). Moreover, we reiterate that "[s]ubject to constitutional limitations, the Pennsylvania General Assembly may require such practices and procedures as it may deem necessary to the orderly, fair, and efficient administration of public elections in Pennsylvania." *Guzzardi*, 99 A.3d at 386; *see also Banfield v. Cortes*, 110 A.3d 155, 176-77 (Pa. 2015) ("the state may enact substantial regulation containing reasonable, non-discriminatory restrictions to ensure honest and fair elections that proceed in an orderly and efficient manner"); *Winston*, 91 A. at 522 ("The power to regulate elections is a legislative one, [which] has been exercised by the General Assembly since the foundation of the government."). Here, the General Assembly enacted the Election Code, which provides for the provisional ballot fail-safe procedures. *See Genser*, 325 A.3d at 475 ("the casting of a provisional ballot is specifically authorized in the Election Code," and "[p]rovisional ballots exist as a fail-safe to preserve access to the right to vote"). A county board of elections can have no valid interest in curtailing those protections established not only in our Constitution, but also by our General Assembly.[47]

---

[47] We take this opportunity to underscore the protections built into the provisional ballot process to "ensure honest and fair elections[.]" *Banfield*, 110 A.3d at 176-77. Electors attempting to vote by provisional ballot are required to sign an affidavit stating: "I do solemnly swear or affirm that my name is _____, that my date of birth is _____, and at the time that I registered I resided at _____ in the municipality of _____ in _____ County of the Commonwealth of Pennsylvania and that (continued…)

Moreover, pre-deprivation notice that an elector's facially defective mail-in ballot return packet was segregated and will likely not be counted at the canvass does not make administration of elections "[dis]orderly," *Guzzardi*, 99 A.3d at 386, and it does not impose any undue expense or burden on the Board. Other counties in Pennsylvania provide notice and instructions on voting by provisional ballots, and even more counties provide "notice and cure" procedures. *See* County Commissioners *Amici* Brief at 12-13; ACLU, *Pennsylvania Counties' Notice-and-Cure Policies*, https://www.aclupa.org/en/pennsylvania-counties-notice-and-cure-policies (last visited

this is the only ballot that I cast in this election[,]" and provide their current address and reason for casting the provisional ballot. 25 P.S. §3050(a.4)(2). That affidavit must be signed by the Judge of Elections and minority inspector. *See id.* The provisional ballot must be placed in a secrecy envelope, which is then placed in a provisional ballot envelope, which the elector signs, and which must remain sealed for return to the county board. *See id.* at §3050(a.4)(3). Within seven days of the election, the county board "shall **examine each** provisional ballot . . . to determine if the individual voting that ballot was entitled to vote at the election district in the election." *Id.* at §3050(a.4)(4) (emphasis added). Representatives for each candidate and political party are allowed to be present while the determinations are being made and to challenge those determinations. *See id.* Such challenges are subject to "a formal hearing" (with notice to the provisional electors and the challengers), which is then appealable to the court of common pleas. *See id.* Before it can count a provisional ballot, the county board is also required to compare the signature on the provisional ballot envelope with the elector's registration form to determine if it is genuine. *See id.* at §3050(a.4)(5)(i). Section 3050 also provides a list of situations where a provisional ballot cannot be counted, which includes where the elector successfully voted by absentee or mail-in ballot. *See id.* at §3050(a.4)(5)(ii); *Genser*, 325 A.3d at 483 ("Subsection (a.4)(5)(i) works in tandem with Subsection (a.4)(5)(ii)(F) to prevent the untenable result of permitting an elector to have the votes on two ballots counted."). These procedures subject the provisional ballot process to intense scrutiny, and along with even more requirements not mentioned here, they ensure the honesty of the provisional ballot process. *See, e.g.,* 25 P.S. §3050(e) ("A person who wilfully commits fraud or who conspires to wilfully commit fraud in relation to any of the provisions of this section commits a felony of the third degree and, upon conviction, shall be sentenced to pay a fine not exceeding fifteen thousand dollars ($15,000) or to undergo a term of imprisonment of not more than seven years, or both. An individual convicted under this subsection shall be barred for life from serving as a judge, inspector or clerk of election, machine inspector translator, county election board official, poll watcher or in any other official capacity relating to the sanctity, observation or conduct of Pennsylvania elections.").

Sept. 24, 2025) (showing as of October 24, 2024, at least thirty-six counties provide for "notice and cure," while an additional ten — including Washington County pursuant to the injunction — enter accurate ballot statuses into the SURE system, which triggers notice about provisional voting).  Indeed, Washington County itself provided "notice and cure" procedures during the 2023 Primary and General Elections.

What's more, the counties are required to use the SURE system anyway, and the SURE system already includes codes that account for these situations.  *See, e.g.*, 25 Pa.C.S. §1222;[48] 4 Pa. Code §183.4.[49]  For instance, the Department's March 11, 2024 SURE system release notes specifically stated the "CANC" codes should "be used when the county has made a final decision as to the ballot, **or it does not offer the opportunity**

---

[48] That statute provides:

> The SURE system shall be developed as a single, uniform integrated computer system.  All commissions shall be connected electronically to the SURE system and shall maintain their registration records in the system.  The SURE system shall, at a minimum, do all of the following:
>
> . . .
>
> (6) Be the general register for a commission once the commission is connected to the SURE system.
>
> . . .
>
> (13) Permit the timely printing and transmission by commissions of district registers and all other information contained in the system **as may be necessary for the operation of the polling places on election days**.
>
> . . .
>
> (20) Identify registered electors **who vote** in an election and the **method by which their ballots were cast**.

25 Pa.C.S. §1222(c) (emphasis added).

[49] "A commission shall enter the following information into the SURE system for a registrant or applicant: . . . Voting history for registrants."  4 Pa. Code §183.4(b)(2).

**to cure.**" Joint Stipulation, Ex. D, at 8-9 (emphasis added)[50]; *contra* Dissenting Op. at 9 n.5 (Brobson, J.) (claiming the "CANC" codes are only "for circumstances where the Board makes a **final** determination to exclude a mail ballot from the count[,]" not for a preliminary segregation decision) (emphasis in original). When a county board entered a "CANC" code after receiving a mail-in ballot return packet with a disqualifying defect, it triggered an email to an elector correctly informing them their "ballot [would] not be counted because" of the specific defect, and that if they were unable to request a new ballot, they could "go to [their] polling place on election day and cast a provisional ballot." Joint Stipulation, Ex. D, at 9; *cf.* 25 P.S. §3150.16(b)(2) ("An elector who requests a mail-in ballot and who is not shown on the district register as having voted may vote by provisional ballot[.]"). The emails generated by the "CANC" codes pursuant to the revisions in the Department's August 23, 2024 release notes are even clearer. For example, the "CANC – No Date" code triggers the following email: "Your ballot may not be counted because you did not date your ballot return envelope. If you receive this email

---

[50] Appellants argue "[t]he Secretary has acknowledged that the 'PEND' and 'CANC' codes are optional, that county boards are not required to use them, and that county boards are not required to trigger the Secretary's automated emails to voters[,]" Appellants' Brief at 9, but the Secretary's statement on this point is unclear. The Secretary does state "[c]ounties have complete discretion on **whether and when** to select a PEND or a CANC code[], including after Election Day." *Amicus* Brief of Sec'y Al Schmidt & Dep't of State at 6 (emphasis in original). But unlike for the "PEND" codes, which the Secretary identifies as "completely optional," the Secretary explains a "CANC" code "is . . . to be applied if the ballot will not be counted, or has not been counted, due to an error." *Id.* at 5-6. It appears the Secretary is not arguing a "Record – Ballot Returned" status never has to be updated to a "CANC" status, just that it is his position the board can wait to do so. *See id.*, citing, *inter alia*, Marks Dep. at 88 ("If the county does not offer notice and cure, it may be the county's practice to leave it in the . . . record ballot returned status until such time that they enter the final disposition of the ballot."). The Board took the opposite approach below. *See* Ostrander Dep. at 198 ("Once the canvass board's decision was made whether the ballot was counted or not counted based on the declaration envelope, I asked the Board if they wanted the codes changed [from "Record – Ballot Returned" to "CANC"], and the Board of Elections did not."). In any case, these positions are not dispositive of our due process inquiry.

on or before election day, you can go to your polling place on election day before 8 p.m. and request a provisional ballot." *Amicus* Brief of Sec'y Al Schmidt & Dep't of State at E64 ("Changes to SURE VR and PA Voter Services as of August 23, 2024").[51]

And it should go without saying, county boards are required to perform their duties honestly to play their part in effectuating the purpose and objective of the Election Code: "[t]o obtain freedom of choice, a fair election and an honest election return." *Pa. Democratic Party*, 238 A.3d at 356 (internal quotation, citation, and brackets omitted); *accord, e.g.*, 25 P.S. §2642(g) (tasking county boards with "instruct[ing] election officers in their duties, calling them together in meeting whenever deemed advisable, and [ ] inspect[ing] systematically and thoroughly the conduct of primaries and elections in the several election districts of the county to the end that primaries and elections may be honestly, efficiently, and uniformly conducted"); *id.* at §2647 ("The amending of any records by any employe of any county board of elections by order of such board shall be construed to have been done by the board itself, which shall likewise be responsible for the correction of any errors in the doing thereof."); 25 Pa.C.S. §1402(c) ("It is the duty of the commission to compare and correct the general register and district registers to ensure their accuracy."). In sum, where the infrastructure of the SURE system already exists, and the Board is required to use the SURE system, there is no additional expense or burden in entering accurate codes. *Cf. Genser*, 325 A.3d at 485 (rhetorically

---

[51] We reiterate that so long as the Board codes all SURE entries accurately, it will be placing all electors on equal footing. *See* Trial Court Op. and Order, 8/23/24, at 27 n.122 (explaining "this injunction . . . is the most uniform resolution available"). Even if an elector opts not to return their mail ballot until the last minute, the Board does not mislead that elector if it enters an accurate SURE code when it reviews the return packet. To the extent those electors who submit a defective mail-in ballot return packet at the last minute would not have time to vote by provisional ballot in such circumstances, the purported burden on their liberty interests would not be imposed by the Board.

questioning "what honest voting principle is violated by recognizing the validity of one ballot cast by one voter").

Based on our balancing of the *Mathews* factors, we affirm the lower courts' determination that the Board's policy resulted in violations of electors' procedural due process rights. Without question, the Board (acting through the elections office staff) violated procedural due process when it segregated electors' presumptively disqualified ballots, and then, via unnecessarily opaque coding in the SURE system, knowingly triggered an email notice to electors that affirmatively misled them about their voting rights.[52] *See, e.g.*, *In re R.M.*, 790 A.2d 300, 306-07 (Pa. 2002) (parenthetically explaining "notice which is confusing, misleading, or inaccurate is insufficient to meet procedural due process requirements, because such notice does not adequately safeguard the right to a meaningful hearing"), *citing Walters v. Reno*, 145 F.3d 1032, 1043 (9th Cir. 1998); *cf. Commonwealth v. Cosby*, 252 A.3d 1092, 1131 (Pa. 2021) ("when a prosecutor makes an unconditional promise of non-prosecution, and when the defendant relies upon that guarantee to the detriment of his constitutional right not to testify, the principle of fundamental fairness that undergirds due process of law in our criminal justice system

---

[52] In *In re Canvass (2024 Primary)*, in addition to the residency requirement issue, we considered whether an elector's failure to sign the outer envelope on his provisional ballot rendered it void so it could not be counted. *See* 322 A.3d at 904-09. We held that it did, based on the plain text of the relevant Code provisions. *See id.* But in doing so, we were sure to note: "[t]here is no suggestion in the record, nor did the trial court find as fact, that the election workers told [the elector] not to sign the envelope. . . . The issue before us might be different if the record reflected that the government or its agents affirmatively dissuaded [the elector] from signing the envelope." *Id.* at 908 n.8. The present appeal is akin to the situation we anticipated in *In re Canvass (2024 Primary)*, since "the government or its agents affirmatively dissuaded" the electors from exercising their right to vote provisionally, even though they were still entitled to do so. *Id.* It is even more straightforward, however, because the hypothetical considered in *In re Canvass (2024 Primary)* pertained to whether such deception would allow the courts to make an equitable determination that the defective provisional ballot could be counted notwithstanding the plain text of the Election Code. Here, by contrast, the focus is on preventing the misleading conduct itself, not on whether an invalid ballot can nonetheless be counted.

demands that the promise be enforced"). Weighing the magnitude of the electors' interests against the dearth of the Board's, we hold that when the Board segregated electors' mail-in ballot return packets for disqualifying errors, and therefore knew the ballots inside were void, it was required to provide accurate notice of the errors to the impacted electors via the entry of accurate SURE codes in the SURE system. Accurate SURE coding would have triggered an email alerting the electors who submitted facially defective mail-in ballots that they still had a right to vote provisionally. Such minimal process was undoubtedly due.[53]

## B. Validity of Ordered Relief

We next address appellants' arguments that the relief ordered by the trial court and affirmed by the Commonwealth Court conflicted with this Court's decision in *Pa. Democratic Party*, the dictates of the Election Code, and an order of this Court in another matter. For the reasons below, we reject those contentions.

---

[53] We recognize the additional relief ordered by the trial court — "to notify any elector whose mail-in packet is segregated for a disqualifying error, so the voter has an opportunity to challenge (not cure) the alleged defects" — is not necessary under current practices or our holdings here regarding entry of accurate SURE codes and 25 P.S. §3157. *See* Trial Court Op. and Order, 8/23/24, at 4. If the Board enters accurate codes into the SURE system upon receipt of defective mail-in ballot return packets, further affirmative notice is not required. We therefore vacate this additional, duplicative relief. Additionally, we emphasize our determination of what process is due is necessarily based on the record before us. *See Bundy*, 184 A.3d at 557 ("Due process is a flexible concept which 'varies with the particular situation.'"), *quoting Zinermon*, 494 U.S. at 127. From the outset, this case has focused on the notice that would be provided by accurate SURE coding. *See* Complaint at ¶¶158-59 ("[A]dditional procedures would not impair the County's interests. Promptly and accurately entering the status of mail-in ballots in the SURE system would pose no administrative burden on the County. . . . For instance, upon receiving a voter's mail-in ballot election workers must already enter a code into the SURE system. They would simply need to enter the correct code to make accurate mail-in ballot status information available to voters and the public."). We do not decide whether different process might be due under different circumstances.

## 1. *Pa. Democratic Party*

Appellants argue throughout their brief that the lower courts' decisions were foreclosed by our decision in *Pa. Democratic Party*. Specifically, they claim that in *Pa. Democratic Party*, this Court "already held that voters have no constitutional, statutory, or legal right to cure a mail-ballot defect, through provisional voting or otherwise." Appellants' Brief at 16-17, *citing Pa. Democratic Party*, 238 A.3d at 374. Through this framing of *Pa. Democratic Party*, appellants argue the lower courts were precluded from finding a liberty interest based on the right to vote by provisional ballot. They also argue the lower courts improperly mandated a "notice and opportunity to cure" procedure on Washington County, and that a provisional ballot is indistinguishable from a "cure." *See id.* at 24-25; *see also id.* at 28 ("this Court has already held that, pursuant to its authority to regulate elections, the General Assembly has forbidden do-overs: [o]nce a voter submits an invalid ballot, there is no cure procedure"), *citing Pa. Democratic Party*, 238 A.3d at 372-74.

We need not dwell long on these arguments because we already rejected them in *Genser*. There, we explained:

> Our decision in *Pa. Democratic Party* addressed only "the 'notice and opportunity to cure' procedure **sought by Petitioner**." *Id.* (emphasis added). We were not asked to nor did we consider provisional voting. Our concern in *Pa. Democratic Party* was whether the spirit of the Election Code or Article I, Section 5 of our Constitution **mandated** a notice and curing policy for defective mail ballots. We concluded that the Constitution left the task to the legislature and that the Election Code "does not provide for the 'notice and opportunity to cure' procedure sought by Petitioner." *Id.* at 374. Again, Petitioner relied only on the Free and Equal Elections Clause and the "spirit of the Election Code." *Id.* at 373. We rejected Petitioner's attempt to impose such procedures on county election boards through judicial means. *Id.*
>
> Here, as the Commonwealth Court correctly discerned, the casting of a provisional ballot is specifically authorized in the Election Code, wholly unlike the amorphous proposed notice and cure policy discussed in *Pa. Democratic Party*. Indeed, as discussed above, the right to cast a

provisional ballot is not just authorized by the Election Code, our General Assembly implemented HAVA's mandate in 2002, long before Act 77 amended the code to permit no-excuse mail-in voting. Provisional ballots exist as a fail-safe to preserve access to the right to vote.

Nor is there any analogy to be drawn from *Pa. Democratic Party* to the case before us. As the Commonwealth Court aptly observed, no ballot is cured when a provisional ballot is counted after a mail ballot is rejected due to a fatal defect in the Return Packet. When the Commonwealth Court ordered that Electors' provisional ballots be counted by the Board, that did not displace the Board's decision not to count Electors' mail-in ballots; indeed, as required by law, those mail-in ballots were not counted. The propriety of counting a provisional ballot is a question of statutory interpretation that, unlike the proposed curing policies at issue in *Pa. Democratic Party*, flows directly from the text of the Election Code. *See* 25 P.S. §§ 3050(a.4)(1) (providing for casting provisional ballots); 3050(a.4)(5)(i) (requiring the counting of provisional ballots).

Appellants' distinction-without-a-difference argument is hollow. The procedure advocated by the Petitioners in *Pa. Democratic Party* contemplates correcting deficiencies in the Return Packet so that the mail-in ballot can be counted. We consider here the utilization of a distinct voting mechanism in the Election Code that is triggered because the mail-in ballot is not counted.

Appellants misstate both non-mandatory notice and cure procedures and statutory provisional voting rights. They argue that "[c]uring refers to fixing and **avoiding the consequences of the voter's error on the mail ballot**, not necessarily making any changes to the 'initial ballot'" and that "counting a provisional ballot in these circumstances remedies – and therefore cures – the voter's failure to comply" with the General Assembly's mandatory Secrecy Envelope protocol. Appellants' Brief at 24 (emphasis added). . . . [C]ounting a provisional ballot occurs only when another ballot attributable to a voter has not been counted. A provisional ballot is intended to alleviate potential disenfranchisement for eligible voters. Counting Electors' provisional ballots, when their mail ballots are void for failing to use a Secrecy Envelope, is a statutory right not contemplated in *Pa. Democratic Party*.

*Genser*, 325 A.3d at 475-76 (emphasis in original; internal footnote omitted). So too here.

We add only that the *Pa. Democratic Party* petitioners, unlike appellees here, did not raise a procedural due process challenge; their claim was premised on the Free and Equal Elections Clause, and they asked the Court to use its equitable authority to "craft [a] meaningful remed[y]" to fill a gap they perceived in the Code. 238 A.3d at 372-73. In

short, just as our decision in *Pa. Democratic Party* did not control in *Genser*, neither does it control here.[54]

## 2. The Election Code

Appellants next argue the Commonwealth Court panel majority's decision contradicts the Election Code because it "requires the Board (i) to determine whether an elector's mail ballot is valid and (ii) to report that determination to the elector, all **before** the election is concluded." Appellants' Brief at 38 (emphasis in original). They rely on Section 3146.8(a) of the Code, which states that "upon receipt of" mail-in ballot return packets, county boards "shall safely keep the ballots in sealed or locked containers until they are to be canvassed[.]" 25 P.S. §3146.8(a). Appellants read that statute as prohibiting county boards from "inspect[ing] or open[ing] a mail-ballot package" upon receipt. Appellants' Brief at 38. They claim the earliest the Board can open and inspect mail ballots is at the pre-canvass, which does not begin until 7:00 a.m. on Election Day. *See id.* at 38-39, *citing* 25 P.S. §§2602(q.1), 3146.8(g)(1.1). Even at the pre-canvass, appellants explain, "no person observing, attending or participating . . . may disclose the results of any portion of any pre-canvass meeting prior to the close of the polls." *Id.* at 39, *quoting* 25 P.S. §3146.8(g)(1.1). They argue the Board cannot ascertain whether the

---

[54] As we acknowledged in *Genser*, "[w]e have not spoken to whether or not the Election Code allows individual counties to utilize notice and cure procedures." *Genser*, 325 A.3d at 475 n.25. Although notice is at issue here, it is grounded in due process and the statutory right to vote provisionally. "Notice and cure" policies, in contrast, enable electors to fix defective mail-in ballot return packets. The issues are distinct. *See id.* at 475 ("The propriety of counting a provisional ballot is a question of statutory interpretation that, unlike the proposed curing policies at issue in *Pa. Democratic Party*, flows directly from the text of the Election Code."). We therefore decline to address the dissents' positions regarding notice and cure policies, since they are not properly at issue in this appeal. *See* Dissenting Op. at 6 (Mundy, J.) ("In my view, we will not have equal or uniform elections if the power of the voters varies based on their counties' notice and cure policies."); Dissenting Op. at 9 (Brobson, J.) ("implement[ing] 'notice and cure' procedures . . . invites an unequal and nonuniform election").

elector made a disqualifying error without inspecting (and, in the case of secrecy envelopes, opening) the mail-in ballot return packet, and that notifying electors of those defects would be a disclosure of the pre-canvass results, all of which would violate the Code.

In appellants' view, since the Election Code forecloses the Commonwealth Court majority's directive, it essentially held a duly enacted statute unconstitutional, contrary to the presumption that such statutes are constitutional. They argue the presumption has particular effect here, where "[t]he power to regulate elections is legislative[.]" *Id.* at 40, *quoting Winston*, 91 A. at 522. Appellants observe the regulation of elections arises in a political area of the law entrusted to the legislature, and absent a "gross abuse," the courts are "unjustified in 'striking down an election law demanded by the people, and passed by the lawmaking branch[.]'" *Id.* at 41, *quoting Winston*, 91 A. at 523. Moreover, appellants claim, the lower court could not simply extricate these provisions from the Election Code, as Act 77 includes a non-severability provision that provides "[i]f any provision of this act or its application to any person or circumstance is held invalid, the remaining provisions or applications of this act are void." *Id.* at 41-42, *quoting* 2019 Pa. SB 421, §11. They believe the non-severability provision would be triggered were we to affirm, and thus invalidate the universal mail-in voting regime created by Act 77.

We reject appellants' argument, as it is at odds with a plain reading of the Election Code. "Pre-canvass" is statutorily defined as "the inspection **and** opening of all envelopes containing official absentee ballots or mail-in ballots, the removal of such ballots from the envelopes **and** the counting, computing and tallying of the votes reflected on the ballots. The term does not include the recording or publishing of the votes reflected on the ballots." 25 P.S. §2602(q.1) (emphasis added). The conjunctive "ands" included in the series of actions comprising the "pre-canvass" make clear that merely looking at the outer ballot-

return envelope (and thus discovering patent disqualifying errors) does not constitute a "pre-canvass." It would be unreasonable to require elections office staff to avoid that kind of "inspection" of a returned mail-in ballot return packet — we cannot expect them to do their job with their eyes shut.[55]

Certainly, boards of elections are prohibited from "pre-canvassing" mail-in ballots, as that term is actually defined, before 7:00 a.m. on Election Day.[56] And appellants are

---

[55] We observe several Election Code provisions contemplate preliminary review of mail-in ballot packets, that is, before the pre-canvass and canvass. For instance, the Code requires the county board to "maintain a record" of "[t]he date on which the elector's **completed** mail-in ballot is received by the county board." 25 P.S. §3150.17(b)(5) (emphasis added); *see id.* §3150.17(c) (further providing "[t]he county board shall compile the records listed under subsection (b) and make the records publicly available upon request within 48 hours of the request"); *id.* §3150.17(a) (establishing the "envelopes on which the executed declarations appear" are themselves "designated and declared to be public records"). Surely, a county board cannot keep a record of the day it received a "completed" mail-in ballot without looking at the mail-in ballot return packet to see whether it has been "completed," especially if such record must be available within 48 hours of a request. *See id.*; *see also Genser*, 325 A.3d at 484 (25 P.S. §3150.16(c) "provides that 'a **completed** mail-in ballot must be received in the office of the county board of elections no later than eight o'clock P.M. on the day of the primary or election.' . . . '[C]ompleted' must then mean that the mandatory requirements for voting by mail-in ballot, defined in a provision preceding the deadline requirement, Section 3150.16(a), have been completed.") (emphasis in original); Joint Stipulation at ¶¶2, 33, 39 (elections office staff segregates mail-in ballots based on facial defects before Election Day). And, as noted by appellees, in *Ball*, this Court ordered county boards to "segregate and preserve" mail ballots with missing or incorrect dates submitted for the 2022 General Election. 289 A.3d at 9. Obviously, we did not view segregating ballots based on facial defects as a violation of the Election Code.

[56] Respectfully, the principal dissent's suggestion we improperly add a "substantive" gloss to the statutory definition of "pre-canvass" is confused. *See* Dissenting Op. at 7 n.4 (Brobson, J.). We are using the statutory definition in Section 2602 to interpret the bounds of the "substantive" prohibition on pre-canvassing before 7:00 a.m. on election day, as provided in Section 3146.8(g)(1.1). On the other hand, if we accepted the principal dissent's cherry-picked conception of pre-canvassing, it is unclear how we would draw any discernible line between pre-canvassing and the administrative handling of received mail-in ballot return packets. As the principal dissent acknowledges, "the county board [of elections] shall maintain a record of . . . [t]he date on which the elector's completed mail-in ballot is received by the county board." *Id.* at 7 n.3, *quoting* 25 P.S. §3150.17(b)(5) (alterations in original). As explained, when a county board receives a mail-in ballot return (continued…)

correct that the courts cannot order them to **open** mail-in ballot return packets before Election Day. It is a stretch, however, to frame the injunction here as requiring that. The trial court's order pertained to instances where "an elector's mail-in packet is segregated for a disqualifying defect[.]" Trial Court Op. and Order, 8/23/24, at 4.[57]

Correspondingly, providing notice to an elector that their mail-in ballot return packet has been segregated because it has a disqualifying defect does not "disclose the results of any portion of any pre-canvass meeting prior to the close of the polls." 25 P.S. §3146.8(g)(1.1). Again, such segregation based on patent defects is not a "pre-canvass," so notifying the elector of the result of the segregation decision cannot implicate the "results" of the "pre-canvass." The injunction relates to what is more correctly considered mail-in ballot **status**, not **results**.

Thus, we emphasize we are not "striking down" or holding unconstitutional any provision of the Election Code, and neither did the lower courts. *Contra* Appellants' Brief

_____

packet, it stamps it with a date and then scans the elector-specific barcode. Then, a dialog box appears, allowing the staff member to update the elector's record in the SURE system. *See* Joint Stipulation, Ex. D, at 4. At the very least, these actions reveal who sent in a mail-in ballot return packet, and when (including whether it was before 8:00 p.m. on election day). But nobody contends this "inspection" constitutes "pre-canvassing." In any event, there is no dispute here that leading up to the 2024 Primary Election, Washington County **did** segregate ballots for disqualifying errors. *See* Joint Stipulation at ¶¶42, 44.

[57] If the Board is not segregating ballots that are missing the secrecy envelope, it is not required under the trial court's order to notify the elector of such defect or otherwise reflect the disqualification of the mail-in ballot when it inputs a SURE code and updates the district register. *See* Trial Court Op. and Order, 8/23/24, at 4. We note that some counties have means for determining whether a mail-in ballot packet is missing a secrecy envelope that do not involve opening the packet; for example, as described in *Genser*, Butler County utilizes a machine called the Agilis Falcon that can predict a so-called "naked ballot" based on its dimensions. *See Genser*, 325 A.3d at 461-62. Another method the Department of State offers is for the counties to punch a hole in the outer declaration envelope, so staff can easily see whether the elector included the yellow secrecy envelope. *See* Joint Stipulation at ¶20. Of course, if the Board is using such a method to segregate ballots based on this defect, the trial court's order would apply.

at 41. Indeed, appellants have identified nothing in the Election Code that forbids voters from completing a provisional ballot on election day when electors make honest mistakes on mail-in ballot return packets, and the General Assembly did not require their right to vote thereafter be held hostage. In line with the purposes of the Election Code — "to obtain freedom of choice, a fair election and an honest election return," *Pa. Democratic Party*, 238 A.3d at 356 (internal quotation and citation omitted) — we decline to read such a punitive element into the Code where it is otherwise silent. Appellants' arguments pertaining to the presumption of constitutionality and Act 77's non-severability provision are therefore inapt. For the reasons above, the Election Code does not foreclose the relief ordered by the courts below.

### 3. Potential for Election Disruption

Appellants finally argue that even assuming the lower courts' rulings were legally correct, they erred by changing election rules during the ongoing election. They rely on our *per curiam* order in *New PA Project Education Fund v. Schmidt*, 327 A.3d 188, 2024 WL 4410884 (Pa. 2024) (*per curiam*), wherein we denied an application for exercise of our King's Bench or extraordinary jurisdiction, explaining "[t]his Court will neither impose nor countenance substantial alterations to existing laws and procedures during the pendency of an ongoing election." 327 A.3d at 189, *citing Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) ("Call it what you will — laches, the *Purcell* principle, or common sense — the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so.") and *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (*per curiam*) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase.").

Appellants warn judicial intervention so close to the election is too disruptive. They note the trial court entered its permanent injunction on August 23, 2024, "just a few weeks before the distribution of mail ballots." Appellants' Brief at 45. They also highlight the fact the Commonwealth Court affirmed on September 24, 2024, after ballots had already been sent out. Thus, appellants conclude, the lower courts "alter[ed] existing laws and procedures during the pendency of an ongoing election." *Id.*, *quoting New PA Proj. Educ. Fund*, 327 A.3d at 189. Further, they believe the procedural changes dictated by the lower courts to be "particularly disruptive," as the Board would have to make "substantial procedural changes," like moving around personnel and resources. *Id.* at 45-46. Appellants argue the *Purcell* principle is reason enough to reverse the decisions below. *See id.* at 47; *see also* Legislators' *Amicus* Brief at 29 (injunction imposed on boards in weeks before the election would "certainly create chaos").

The import of this issue has undoubtedly changed since we granted allowance of appeal on October 5, 2024, one month before the 2024 General Election. *See Ctr. for Coalfield Justice*, 327 A.3d at 184-85. Concerns about the issuance of the injunction too close to the 2024 General Election are, of course, now moot. Regardless, we note our *per curiam* order in *New PA Project Education Fund* posed no impediment to the lower courts' decisions. Although we have yet to elaborate on the important principle discussed in that order, and we decline to do so in the context of this matter, it is enough to recognize the trial court's injunction was entered **before** mail-in ballots were even sent out to electors. Thus, the Commonwealth Court's affirmance below cannot reasonably be said to have imposed "substantial alterations to existing laws and procedures during the pendency of an ongoing election." *New PA Proj. Educ. Fund*, 327 A.3d at 189. By affirming the trial court's injunction, the intermediate appellate court maintained the *status quo* that existed prior to the start of mail-in voting. This is bolstered by our decision today,

as we confirm a mandate to not mislead electors and to accurately enter codes into SURE can hardly be deemed a "substantial alteration[ ] to existing laws and procedures[.]" *Id.* In fact, with the benefit of hindsight, we can now say for certain the injunction was both feasible and non-disruptive, as the Board entered accurate SURE codes in 2023 and, to our knowledge, was again able to do so during the 2024 General Election in compliance with the injunction. For all these reasons, appellants' reliance on our order in *New PA Project Education Fund* is misplaced here.

### III.  Conclusion & Mandate

Appellants' argument that the Board should be allowed **to hide** the readily ascertainable status of electors' mail-in ballots has a strangely punitive dimension that belies not only the text of the Election Code, but also our Commonwealth's "longstanding and overriding" policy to protect — rather than restrict — the elective franchise. *See, e.g.*, *Pa. Democratic Party*, 238 A.3d at 361. We must interpret the Election Code and its statutory procedures in a way that "favors the fundamental right to vote and enfranchises, rather than disenfranchises, the electorate." *Id.* Reading the Code as allowing county boards to withhold readily available information from voters does not serve that goal.

When appellants argue against the relief afforded by the lower courts, they characterize electors who make minor errors on mail ballots as "noncompliant," while fingerwagging that the General Assembly "has forbidden do-overs." Appellants' Brief at 28 ("The Pennsylvania Constitution does not entitle noncompliant voters to notice of defects that they, by definition, cannot correct."). But this case is not about do-overs. It is not about correcting a defective mail-in ballot return packet. It is not about a "second bite" at the proverbial apple, and it is not about double-voting. It is about allowing a voter who made a mistake on a mail-in ballot return packet — the kind of mistake that will likely disqualify the ballot and invalidate the elector's attempt to vote — to avail herself of the

remaining "fail-safe" attempt to exercise her fundamental right: completing a provisional ballot on Election Day. If her segregated mail-in ballot is ultimately discarded, then her provisional vote will count — this is one vote, not two. Similarly, if her segregated mail-in ballot is ultimately counted, then the provisional vote is thrown away — this is one vote, not two. In both scenarios, however, the only way the elector gets her single vote counted is to be given the easily accessible information that was intentionally withheld in this case.

Thus, we affirm the lower courts' decisions, except to the extent they suggest electors must be allowed to challenge canvassing and computation decisions pursuant to 25 P.S. §3157 before the canvass occurs. For that reason, and because an accurate SURE code entry will effectuate notice, we vacate the portion of the trial court's order requiring the Board "to notify any elector whose mail-in packet is segregated for a disqualifying error, so the voter has an opportunity to challenge (not cure) the alleged defects." Trial Court Op. and Order, 8/23/24, at 4. The injunction and order otherwise remain intact.

Jurisdiction relinquished.

Chief Justice Todd and Justices Donohue and McCaffery join the opinion.

Justice Mundy files a dissenting opinion.

Justice Brobson files a dissenting opinion in which Justices Wecht and Mundy join.